**ASTORIA INDUSTRIES OF
IOWA, INC., Appellant**

v.

**SNF, INC. d/b/a Brand FX Body
Company, Appellee.**

No. 2–05–315–CV.

Court of Appeals of Texas,
Fort Worth.

March 29, 2007.

Rehearing Overruled April 26, 2007.

Law Offices of Michael W. Minton, P.L.L.C., Michael W. Minton, Irving, and Renwick & Associates, PC, Malcolm G. Renwick, Carrollton, for Appellant.

Kelly, Hart & Hallman, LLP, Hugh G. Connor, II, Michael D. Anderson, Fort Worth, for Appellee.

Panel A: CAYCE, C.J.; LIVINGSTON and McCOY, JJ.

## OPINION ON REHEARING

JOHN CAYCE, Chief Justice.

We withdraw our opinion and judgment of October 19, 2006 and substitute the following. We grant in part and deny in part the motion for rehearing filed by Astoria Industries of Iowa, Inc. (Astoria) and deny the motion for attorney's fees and costs filed by SNF, Inc. d/b/a Brand FX Body Company (Brand FX).

## I. INTRODUCTION

In this interlocutory appeal, Astoria appeals from the trial court's denial of its motions for summary judgment on Brand FX's claims for business disparagement, false advertising, and tortious interference with prospective business relations, among other causes of action. Astoria contends that we have jurisdiction over this appeal under section 51.014(a)(6) of the civil practice and remedies code because its motions for summary judgment were based in whole or in part on a claim or defense arising under the First Amendment.[1] In

1. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(6) (Vernon Supp.2006).

ten issues, Astoria complains that the trial court improperly denied its summary judgment motions. Brand FX disagrees that we have jurisdiction over the appeal and urges us to dismiss it. We hold that we have jurisdiction over part, but not all, of the appeal under section 51.014(a)(6). We affirm in part, reverse and render in part, and dismiss in part.

## II. BACKGROUND FACTS AND PROCEDURAL HISTORY

Astoria and Brand FX are business competitors. They manufacture and sell fiberglass utility and service bodies and toppers [2] for commercial vehicles. Brand FX's topper utilizes a stair-step roof line that Brand FX claims is unique and brand-distinguishing. Initially, Astoria's only topper design had a rounded or domed roof line. In late 2002, however, Astoria developed a topper with a stair-step design virtually identical to Brand FX's topper for Cook's Pest Control. Astoria's chief engineer, Randy Thole, acknowledged that Astoria developed the stair-step design topper for Cook's Pest Control as similar to Brand FX's design as possible.

Brand FX contends that Astoria switched to the stair-step topper design to take Cook's Pest Control's business from Brand FX by offering the topper for over $1000 less than the price that Brand FX charged. Brand FX further contends that Astoria used illegal methods to design its stair-step topper, including "nefariously" obtaining Brand FX's design drawings and using a Brand FX topper to assist Astoria in making the mold for its replica topper.

Thereafter, in February 2003, Astoria began running a "DARE TO COMPARE" advertisement in an industry trade journal (the Advertisement). The Advertisement ran ten times over the course of fourteen months. The Advertisement begins, "When choosing fiberglass utility bodies, **Astoria Industries of Iowa** should be your supplier!" Then the Advertisement compares "High Quality Astoria Bodies vs. Low Quality Brand X Bodies." Regarding the latter, the Advertisement states, (1) "No Engineering and built with sub-standard materials"; (2) "Short term cost with long term expenses"; (3) "Built to their standard"; and (4) "1–year warranty."

Brand FX contends that Astoria's reference to "Brand X Bodies" is a poorly-disguised reference to Brand FX's business name of Brand FX Body Company. Brand FX further contends that three of the statements in the Advertisement are statements of fact that are demonstrably false: (1) "No Engineering and built with sub-standard materials"; (2) "Short term cost with long term expenses"; and (3) "Built to their standard." Brand FX also asserts that Astoria knew the statements were false when it ran the ad, or at least failed to perform any sort of investigation regarding the truthfulness of the statements.

In late May 2003, Brand FX notified Astoria of Brand FX's belief that the Advertisement was defamatory and asked Astoria to stop running it. Astoria continued to run the Advertisement through April 2004.

As a result of Astoria's conduct, Brand FX sued Astoria for business disparagement and defamation per se, false advertising under the Lanham Act,[3] tortious

---

**2.** "Utility" and "service" bodies are interchangeable terms. A utility body is a storage compartment that runs alongside the bed of a commercial truck. A topper is a structure that covers the bed of a commercial truck.

**3.** *See* 15 U.S.C.A. § 1125(a)(1)(B) (West 1998) ("Any person who, . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, ser-

interference with prospective relations, trade dress infringement, unfair competition, common-law misappropriation, and trade secret misappropriation. In five motions, Astoria moved for traditional and/or no-evidence summary judgments on Brand FX's business disparagement, trade dress infringement, false advertising, tortious interference, unfair competition, and common-law misappropriation claims. After a hearing, the trial court denied the motions in a single order. This appeal followed.

## III. JURISDICTION

### A. Availability of Interlocutory Appeal

■ Because an order denying a motion for summary judgment is interlocutory and generally not appealable,[4] we must first determine whether we have jurisdiction over this appeal.

Astoria contends that the trial court's order is appealable under section 51.014(a)(6) of the civil practice and remedies code, because Astoria's no-evidence motion for summary judgment on Brand FX's business disparagement, false advertising, and tortious interference claims is based on a claim or defense arising under the Free Speech Clauses of the First Amendment and article I, section 8 of the Texas Constitution. Section 51.014(a)(6) provides that a person may appeal an interlocutory order that

denies a motion for summary judgment that is based in whole or in part upon a claim against or a defense by ... a person whose communication appears in or is published by the electronic or print media, arising under the free speech or free press clause of the First Amendment to the United States Constitution,

or Article I, Section 8, of the Texas Constitution[.][5]

Brand FX contends that section 51.014(a)(6) does not apply here because its business disparagement, false advertising, and tortious interference claims do not arise under the federal or state Free Speech Clauses and because Astoria did not, and could not, raise the issue of free speech as a defense in its no-evidence motion for summary judgment.

In its no-evidence motion for summary judgment, Astoria expressly alleged that it was entitled to summary judgment on Brand FX's business disparagement, false advertising, and tortious interference claims because there was no evidence that the statements in the Advertisement were false, disparaging statements of fact rather than mere statements of opinion protected by the federal and state Free Speech Clauses. Specifically, Astoria asserted as follows:

Astoria is entitled to summary judgment as a matter of law on [Brand FX's] claims for business disparagement, false advertising under the Lanham Act, and tortious interference with prospective business relations for the following reasons:

1. Astoria's statements in its advertisement were nondefamatory statements, or in the alternative, statements of opinion protected under the First Amendment of the United States Constitution and Tex. Const. Art. I, § 8 of the Texas Constitution.

. . . .

### B. Business disparagement claim.

**4.** *Cincinnati Life Ins. Co. v. Cates,* 927 S.W.2d 623, 625 (Tex.1996).

**5.** TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(6).

vices, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.").

Astória is entitled to summary judgment on BFX's claim because there is no evidence giving rise to a fact question as to the following elements necessary to establish business disparagement:

a. Publication of false and disparaging information about the plaintiff;

. . . .

With regard to the published information, BFX must present competent, admissible evidence that the advertising or any other statements made the basis of this suit were false, defamatory statements of fact about BFX. Statements of opinion are not actionable because opinions are protected by the First Amendment of the United States Constitution and Art. I, § 8 of the Texas Constitution.

. . . .

**D. Lanham Act false advertising claims.**

Astoria is entitled to summary judgment on BFX's false advertising claims under the Lanham Act because there is no evidence giving rise to a fact question as to each of the following elements:

(1) A false or misleading statement of fact about a product;

. . . .

The first element requires . . . a showing of misleading statements of fact. . . . Statements of opinion are not actionable under the Lanham Act.

Thus, the record clearly shows that Astoria's no-evidence motion for summary judgment was, indeed, based on a defense arising under the federal and state Free Speech Clauses.

Brand FX asserts, however, that Astoria's free speech defense is not the proper subject of a no-evidence motion for summary judgment because it is an affirmative defense on which Astoria had the burden of proof, and rule 166a(i) prohibits a party from moving for a no-evidence summary judgment on claims or defenses on which it has the burden of proof.[6]

 Whether Astoria was entitled to challenge Brand FX's business disparagement, false advertising, and tortious interference claims in its no-evidence motion for summary judgment depends upon which party had the burden of proving the alleged falsity of the Advertisement. A business disparagement claim and a false advertising claim are similar in some respects to a defamation claim.[7] All three claims involve the imposition of liability for injuries sustained by the plaintiff through publications to third parties of false statements of fact.[8] One significant difference

6. *See* TEX.R. CIV. P. 166a(i) (providing that a party may move for a no-evidence summary judgment on claims or defenses on which an *adverse* party has the burden of proof); *Keszler v. Mem'l Med. Ctr. of E. Tex.*, 105 S.W.3d 122, 126 (Tex.App.-Corpus Christi 2003, no pet.) (holding same); *see also Battin v. Samaniego*, 23 S.W.3d 183, 185–86 (Tex.App.-El Paso 2000, pet. denied) (holding that the defendant was not entitled to a no-evidence summary judgment on its own affirmative defense).

7. *Forbes Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 170 (Tex.2003). To maintain a defamation cause of action, the plaintiff must prove that the defendant (1) published a state-

ment; (2) that was defamatory concerning the plaintiff; (3) while acting with either actual malice, if the plaintiff was a public official or public figure, or negligence, if the plaintiff was a private individual, regarding the truth of the statement. *WFAA–TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex.1998), *cert. denied*, 526 U.S. 1051, 119 S.Ct. 1358, 143 L.Ed.2d 519 (1999).

8. *See Logan v. Burgers Ozark Country Cured Hams, Inc.*, 263 F.3d 447, 462 (5th Cir.2001) (false advertising); *WFAA–TV, Inc.*, 978 S.W.2d at 571 (defamation); *Hurlbut v. Gulf Atlantic Life Ins. Co.*, 749 S.W.2d 762, 766 (Tex.1987) (business disparagement).

among the three torts, however, is the party who has the burden of proving the truth or falsity of the publication at issue. In a defamation action, the publication is presumed to be false, and truth is an affirmative defense on which the defendant has the burden of proof.[9] In a business disparagement or false advertising case, however, there is no presumption of falsity; instead, the plaintiff has the burden of proving the falsity of the publication as part of its cause of action.[10] Thus, unlike a defamation action, where the plaintiff has the benefit of a presumption that the publication is false and the defendant has the burden to prove that the publication is true, the plaintiff in a business disparagement or false advertising case has the burden of proving that the publication on which its claim is based is false. The defendant in such cases has no burden to prove the publication is true.

■ Likewise, to the extent that a claim for tortious interference is based on an assertion that the tortious act was a false statement of fact, the plaintiff has the burden of proving the falsity of the publica-

tion.[11] The defendant in such a case does not have the burden of proving that the publication was true.

We, therefore, hold that, because Astoria's no-evidence motion for summary judgment was based in part on its free speech defense to Brand FX's business disparagement, false advertising, and tortious interference claims and Brand FX had the burden of proving the falsity of the Advertisement to establish those claims, Astoria's free speech defense was a proper subject of its no-evidence motion for summary judgment and the trial court's order denying the motion is appealable under section 51.014(a)(6).

## B. Scope of Our Jurisdiction

■ Brand FX contends that our appellate jurisdiction is limited to reviewing the portion of the trial court's order related to those claims against which Astoria asserted a free speech defense and does not extend to claims or defenses that do not implicate free speech.[12] We agree.

9. *Hurlbut*, 749 S.W.2d at 766; *see also* Tex. Civ. Prac. & Rem.Code Ann. § 73.005 (Vernon 2005) (providing that truth is a defense to a defamation action).

10. *Hurlbut*, 749 S.W.2d at 766; *see also Logan*, 263 F.3d at 462; *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 495–96 (5th Cir.2000), *cert. denied*, 532 U.S. 920, 121 S.Ct. 1355, 149 L.Ed.2d 285 (2001).

11. *See Ash v. Hack Branch Distrib. Co.*, 54 S.W.3d 401, 413–14 (Tex.App.-Waco 2001, pet. denied) (discussing the elements that a plaintiff must prove in a tortious interference case).

12. There appears to be a split of authority in the courts of appeals regarding the scope of our jurisdiction over an order denying a motion for summary judgment that is based only in part on the Free Speech Clauses. *Compare KTRK Television, Inc. v. Fowkes*, 981 S.W.2d 779, 787 (Tex.App.-Houston [1st Dist.] 1998,

pet. denied) (concluding that the court of appeals had jurisdiction under section 51.014(a)(6) to consider only claims on which summary judgment was denied that "were defended in whole or in part on free speech grounds"), *disapproved on other grounds*, *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103 (Tex.2000), *with Cox Tex. Newspapers, L.P. v. Wootten*, 59 S.W.3d 717, 720–21 (Tex.App.-Austin 2001, pet. denied); *Am. Broadcasting Cos. v. Gill*, 6 S.W.3d 19, 26–27 (Tex.App.-San Antonio 1999, pet. denied), *disapproved on other grounds, Turner v. KTRK Television, Inc.*, 38 S.W.3d 103 (Tex.2000), and *Delta Air Lines, Inc. v. Norris*, 949 S.W.2d 422, 429 (Tex.App.-Waco 1997, writ denied) (all holding that courts of appeals have jurisdiction under 51.014(a)(6) to review the entire order denying summary judgment, including claims or defenses that do not arise under the Free Speech Clauses).

To determine the scope of our jurisdiction, we look to the legislature's intent in enacting section 51.014(a)(6).[13] Unless a statute is ambiguous, we discern that intent from the language of the statute itself.[14] We cannot construe a statutory provision to lead to an absurd result if the provision is subject to another more reasonable interpretation.[15] Further, we consider the provisions of a statute as a whole and not in isolation.[16]

The pertinent language of section 51.014(a)(6) provides that "[a] person may appeal from an interlocutory order ... that ... denies a motion for summary judgment that is based in whole or in part upon a claim ... or defense ... arising under the free speech ... clause."[17] A plain reading of this language evidences clear legislative intent that a party seeking summary judgment on claims or defenses that implicate free speech be entitled to appeal a trial court's denial of this relief.[18]

Nothing in the language of section 51.014(a)(6), however, suggests to us that there is a legislative intent to permit an interlocutory appeal from summary judgment rulings on non-free speech claims and defenses simply because they happen to be included in the same motion.[19]

This strict interpretation of section 51.014(a)(6) is entirely consistent with the way courts have construed similar subsections of this statute. For instance, section 51.014(a)(5) provides that "[a] person may appeal from an interlocutory order ... that ... denies a motion for summary judgment that is based on an assertion of immunity by an individual who is an officer or employee of the state."[20] Courts have construed this subsection to mean that only the part of an order denying summary judgment based on official immunity is reviewable by interlocutory appeal, even if the order denies summary judgment on other grounds as well.[21] Likewise, section

---

13. *Continental Cas. Co. v. Downs*, 81 S.W.3d 803, 805 (Tex.2002); *Nat'l Liab. & Fire Ins. Co. v. Allen*, 15 S.W.3d 525, 527 (Tex.2000).

14. *Downs*, 81 S.W.3d at 805; *see* TEX. GOV'T CODE ANN. § 311.011(a) (Vernon 2005) ("Words and phrases shall be read in context and construed according to the rules of grammar and common usage."); *id.* § 312.002(a) (providing that words shall be given their ordinary meaning).

15. *C & H Nationwide, Inc. v. Thompson*, 903 S.W.2d 315, 322 n. 5 (Tex.1994), *abrogated on other grounds*, *Battaglia v. Alexander*, 177 S.W.3d 893 (Tex.2005); *Sharp v. House of Lloyd, Inc.*, 815 S.W.2d 245, 249 (Tex.1991).

16. *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 493 (Tex.2001).

17. TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(6).

18. *See Fowkes*, 981 S.W.2d at 787.

19. *But see Delta Air Lines*, 949 S.W.2d at 429 ("A plain reading of the statute shows that the appeal is from 'the order.' ... Thus, when

section 51.014(6) applies, an order denying a motion for summary judgment is fully appealable."); *see also Cox Tex. Newspapers, L.P.*, 59 S.W.3d at 720–21 (following *Delta Air Lines* and holding that, "in the interest of judicial economy, we may consider on appeal any claim raised in the media defendant's motion and denied by the trial court"); *Am. Broadcasting Cos.*, 6 S.W.3d at 26 (following *Delta Air Lines* and referring to *KTRK Television, Inc.'s* contrary holding as dicta).

20. TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(5) (Vernon Supp.2006).

21. *See Tex. State Technical Coll. v. Cressman*, 172 S.W.3d 61, 64–65 (Tex.App.-Waco 2005, pet. denied) (holding that the scope of its jurisdiction under section 51.014(a)(5) was limited to review of the trial court's denial of summary judgment on appellants' official immunity defense and did not extend to their contention that appellees had failed to state a claim for illegal eavesdropping); *City of Alamo v. Holton*, 934 S.W.2d 833, 836 (Tex.App.-Corpus Christi 1996, no writ) (holding that its interlocutory jurisdiction under section 51.014(a)(5) was limited to reviewing the

51.014(a)(8) provides that "[a] person may appeal from an interlocutory order ... that ... grants or denies a plea to the jurisdiction by a governmental unit."[22] Courts have construed this subsection to mean that only the part of an order granting or denying a plea to the jurisdiction is reviewable by interlocutory appeal, even if the trial court's order also denies other relief.[23]

It is well settled that an order denying a motion for summary judgment is not appealable unless a statute explicitly provides appellate jurisdiction.[24] To construe section 51.014(a)(6) as permitting interlocutory appeal of any and all issues raised in a motion for summary judgment that is based in part on claims or defenses arising under the Free Speech Clauses

would allow a party to circumvent this restriction and would render meaningless the provisions of section 51.014 that limit interlocutory appeals to the matters enumerated in the statute.[25] We may not construe a statute in any manner that fails to give effect to all the provisions the legislature enacted or that reduces any provision to mere surplusage.[26]

For these reasons, we hold that only the portion of the trial court's order denying summary judgment on Brand FX's business disparagement, false advertising, and tortious interference claims—the only claims that Astoria defended on free speech grounds—is appealable by interlocutory appeal under section 51.014(a)(6). Our jurisdiction does not extend to the

merits of the city's official immunity defense and did not extend to the city's sovereign immunity defense); *Boozier v. Hambrick*, 846 S.W.2d 593, 596 (Tex.App.-Houston [1st Dist.] 1993, no writ) (holding that the appellate court had jurisdiction under section 51.014(a)(5) to review denial of summary judgment based on the movant's official immunity defense, but not on the movant's defenses of truth, privilege, estoppel, and no interference with contract).

**22.** Tex. Civ. Prac. & Rem.Code Ann. § 51.014(a)(8) (Vernon Supp.2006).

**23.** *See Ware v. Miller*, 82 S.W.3d 795, 800 (Tex.App.-Amarillo 2002, pet. denied) (holding that it had jurisdiction over trial court's order denying defendants' plea to the jurisdiction based on official immunity but not based on their challenges to plaintiff's standing made in their individual capacities); *Montgomery County v. Fuqua*, 22 S.W.3d 662, 664 (Tex.App.-Beaumont 2000, pet. denied) (exercising jurisdiction over the appeal from the trial court's order denying defendant's motion to dismiss based on a plea to the jurisdiction but not based on the statute of limitations); *City of El Campo v. Rubio*, 980 S.W.2d 943, 944, 949 (Tex.App.-Corpus Christi 1998, pet. dism'd w.o.j.) (exercising jurisdiction over the part of the trial court's order denying a plea to the jurisdiction and motion for summary

judgment based on official immunity, but not over the part denying summary judgment on plaintiff's negligence and intentional infliction of emotional distress claims).

**24.** *Stary v. DeBord*, 967 S.W.2d 352, 352–53 (Tex.1998); *Cincinnati Life Ins. Co.*, 927 S.W.2d at 625. An interlocutory order that is explicitly appealable under section 51.014 may not be used as a vehicle for carrying other nonappealable interlocutory orders to the appellate court. *See Kaplan v. Tiffany Dev. Corp.*, 69 S.W.3d 212, 217 (Tex.App.-Corpus Christi 2001, no pet.); *City of Arlington v. Tex. Elec. Serv. Co.*, 540 S.W.2d 580, 582 (Tex.Civ.App.-Fort Worth 1976, writ ref'd n.r.e.).

**25.** Astoria's reliance on *In re B.L.D.* as authority for its assertion that we have jurisdiction over the entire order is misplaced. *See* 113 S.W.3d 340, 349 (Tex.2003) (holding that an appellate court generally will decide constitutional questions only when it cannot resolve issues on nonconstitutional grounds), *cert. denied*, 541 U.S. 945, 124 S.Ct. 1674, 158 L.Ed.2d 371 (2004). *B.L.D.* is inapposite; the appellate court in that case had jurisdiction to review the trial court's entire order because it was final.

**26.** *Mobil Oil Corp. v. Shores*, 128 S.W.3d 718, 725 (Tex.App.-Fort Worth 2004, no pet.).

part of the trial court's order disposing of claims against which Astoria did not assert free speech as a defense.[27]

We now turn to the merits of Astoria's appealable complaints.

## IV. NO–EVIDENCE SUMMARY JUDGMENT BASED ON FREE SPEECH GROUNDS

In its first and eighth issues, Astoria contends that the trial court improperly denied Astoria's motion for a no-evidence summary judgment on Brand FX's business disparagement claim and its false advertising claim under the Lanham Act because Brand FX failed to produce evidence that the statements in the Advertisement were false statements of fact rather than nonactionable statements of opinion. In its third issue, Astoria argues that the trial court improperly denied Astoria's no-evidence motion for summary judgment because Brand FX did not put on any evidence that it suffered damages as a result of the Advertisement.

### A. Standard of Review

After an adequate time for discovery, the party without the burden of proof may, without presenting evidence, move for summary judgment on the ground that there is no evidence to support an essential element of the nonmovant's claim or defense.[28] The motion must specifically state the elements for which there is no evidence.[29] The trial court must grant the motion unless the nonmovant produces summary judgment evidence that raises a genuine issue of material fact.[30]

When reviewing a no evidence summary judgment, we examine the entire record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion.[31] If the nonmovant brings forward more than a scintilla of probative evidence that raises a genuine issue of material fact, then a no-evidence summary judgment is not proper.[32]

### B. Special Damages Resulting from Business Disparagement

■ Astoria contends that Brand FX failed to present legally sufficient evidence of special damages in response to Astoria's no-evidence motion for summary judgment on Brand FX's business disparagement claim.

■ To prevail on a business disparagement claim, a plaintiff must establish that (1) the defendant published a false, defamatory statement of fact about the plaintiff, (2) with malice, (3) without privilege, (4) that resulted in special damages to the plaintiff. To prove special damages, the plaintiff must prove that the disparaging communication played a substantial part in inducing third parties not to deal with the plaintiff, resulting in a direct pecuniary loss that has been realized or liquidated, such as specific lost sales, loss of trade, or loss of other dealings.[33]

27. *See KTRK Television, Inc.*, 981 S.W.2d at 787.

28. Tex.R. Civ. P. 166a(i).

29. *Id.; Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 207 (Tex.2002).

30. *See* Tex.R. Civ. P. 166a(i) & cmt.; *Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002).

31. *Sudan v. Sudan*, 199 S.W.3d 291, 292 (Tex. 2006).

32. *Moore v. K Mart Corp.*, 981 S.W.2d 266, 269 (Tex.App.-San Antonio 1998, pet. denied).

33. *Hurlbut*, 749 S.W.2d at 767; *see also* Restatement (Second) of Torts § 632(a) & cmt. b (1977); 4 Texas Torts & Remedies § 52.10[3] (J. Hadley Edgar, Jr. & James B. Sales eds., 2005).

▇ We agree that Brand FX did not present legally sufficient evidence of special damages that it had incurred as a result of the Advertisement. Brand FX argues that it "suffered at least $76,000 in damages" associated with corrective or remedial advertising [34] and relies on the affidavit of its expert, Daniel L. Jackson. This affidavit, however, simply reports the opinion of Tom Prikryl, the president of an advertising agency, that "Brand FX will have to spend approximately $76,200 in corrective advertising over a twelve-month period to counteract Astoria's negative advertising." Assuming, for argument's sake, that this statement by Jackson is not inadmissible hearsay, it is not evidence that Brand FX has actually incurred any corrective advertising expenses. At most, it is only evidence of what such advertising might cost if Brand FX were to choose to purchase it. Further, Alfred Lee Finley, Brand FX's owner and vice president, testified by deposition that "we don't know anybody that lost sales directly because of the ad," and Gary Heisterkamp, Brand FX's president, testified that he could not recall the identity of a single customer that had refused to buy Brand FX's products because of Astoria's actions.

Accordingly, we hold that Brand FX presented no evidence that it incurred special damages in the form of corrective advertising costs or lost sales as a result of the Advertisement in response to Astoria's no-evidence motion for summary judgment on Brand FX's business disparagement claim. Therefore, we sustain Astoria's first and third issues.[35]

## C. False Advertising

Next, we consider Astoria's complaint that it was entitled to a no-evidence summary judgment on Brand FX's Lanham Act false advertising claim.

### 1. Elements of a Prima Facie Claim of False Advertising

▇ To establish a prima facie case of liability for false advertising under the Lanham Act, the plaintiff must show that (1) the defendant made a false statement of fact [36] about its product in a commercial

---

**34.** Brand FX's damages claim is based on section 633 of the Restatement, which provides that recovery is also permitted for "the expense of measures reasonably necessary to counteract the publication," such as expenses incurred in a suit to quiet title or the cost of notifying customers of an injurious publication's falsity or the publication of denials. RESTATEMENT (SECOND) OF TORTS § 633(1)(b) & cmt. k (1977). We note that neither the Supreme Court of Texas nor any intermediate court of appeals has adopted this part of the Restatement or held that this type of pecuniary loss is compensable in Texas in a business disparagement case. *See, e.g., Tex. Beef Cattle Co. v. Green*, 921 S.W.2d 203, 208–09 (Tex. 1996) (holding that a plaintiff in a malicious prosecution case cannot recover costs incident to defending a civil lawsuit absent a showing of special damages, i.e., an arrest or criminal prosecution); *A.H. Belo Corp. v. Sanders*, 632 S.W.2d 145, 145–46 (Tex.1982) (holding, in a slander of title case, that the plaintiff could not recover damages absent a showing that he had lost specific sales on the subject property and rejecting the application of Restatement § 633 to hold otherwise); *see also C.P. Interests, Inc. v. Ca. Pools, Inc.*, 238 F.3d 690, 695–96 (5th Cir.2001) (holding that, under Texas law, attorney's fees are not a form of pecuniary loss and do not constitute special damages in a business disparagement case).

**35.** In light of our holding regarding these issues, we need not consider Astoria's second and ninth issues, in which it complains that Jackson's affidavit contains inadmissible hearsay and that Brand FX did not produce any evidence of malice. *See* TEX.R.APP. P. 47.4 (providing that a court of appeals need address only the issues raised that are necessary to the final disposition of the appeal).

**36.** A statement of fact states a "specific and measurable claim, capable of being proved false or of being reasonably interpreted as a

advertisement; (2) the statement actually deceived or has a tendency to deceive a substantial segment of its audience; (3) the deception is likely to influence a purchasing decision; (4) the defendant caused the false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result.[37]

The plaintiff must prove that the statement of fact is either literally false or that it is likely to mislead and confuse others.[38] A statement of fact is literally false when the evidence affirmatively shows that it is not true.[39] If the statement is shown to be literally false, the plaintiff is not required to show that the statement misled customers and likely influenced their purchasing decisions. Rather, "[i]n such a circumstance, the court will assume that the statements actually misled consumers."[40] On the other hand, if the statement is either ambiguous or true but misleading, the plaintiff must present evidence that consumers were actually deceived by the statement.[41]

Subject to the principles of equity, the damages to which a plaintiff may be entitled under the Lanham Act include the defendant's profits, any damages sustained by the plaintiff, and the costs of the action.[42] Injunctive relief is also available.[43]

### 2. Statements in the Advertisement

Astoria concedes that affidavit evidence from Brand FX's customers may create a fact issue regarding whether the statements in the Advertisement were directed at Brand FX,[44] but it argues that the statements are not statements of fact or, in the alternative, are not literally false. Consequently, we turn to the content of the statements themselves.

The Advertisement asserts, among other things, that "High Quality Astoria Bodies" are "Engineered and built with quality materials to be long lasting and durable," but "Low Quality Brand X Bodies" have "No engineering and [are] built with substandard materials."

Astoria argues that the "No engineering" statement is "nothing more than

statement of objective fact." *Pizza Hut, Inc.*, 227 F.3d at 495 (quoting *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir.1999)). It is one that "admits of being adjudged true or false in a way that ... admits of empirical verification." *Id.; see also Presidio Enters., Inc. v. Warner Bros. Distrib. Corp.*, 784 F.2d 674, 679 (5th Cir.1986).

37. *Logan*, 263 F.3d at 462; *Pizza Hut, Inc.*, 227 F.3d at 495.

38. *Pizza Hut, Inc.*, 227 F.3d at 495.

39. *See Logan*, 263 F.3d at 462; *Edmark Indus. SDN. BHD. v. S. Asia Int'l (H.K.) Ltd.*, 89 F.Supp.2d 840, 845 (E.D.Tex.2000) (both holding that statements were literally false where the evidence showed that the defendant's products did not have all the features they were advertised to have); *see also Castrol, Inc. v. Quaker State Corp.*, 977 F.2d 57, 63 (2d Cir.1992) (holding that, in a compara-

tive advertising case, a statement is literally false if the evidence affirmatively shows that the defendant's product is not, as claimed, superior to the plaintiff's product).

40. *Logan*, 263 F.3d at 462 (quoting *Pizza Hut, Inc.*, 227 F.3d at 497); *accord IQ Prods. Co. v. Pennzoil Prods. Co.*, 305 F.3d 368, 375 (5th Cir.2002), *cert. denied*, 538 U.S. 944, 123 S.Ct. 1632, 155 L.Ed.2d 485 (2003).

41. *Pizza Hut, Inc.*, 227 F.3d at 497.

42. 15 U.S.C.A. § 1117(a) (West Supp.2006).

43. *Id.* § 1116(a).

44. *See Allied Mktg. Group*, 111 S.W.3d at 175; *Diaz v. Rankin*, 777 S.W.2d 496, 499–500 (Tex.App.-Corpus Christi 1989, no writ) (both holding that evidence that one person reasonably recognized the alleged defamatory statement as referring to the plaintiff was sufficient to defeat summary judgment).

rhetorical hyperbole" and that it is simply inconceivable that readers of a trade journal about utility and telecommunication service vehicles would ever believe that a product could be manufactured without resort to at least some engineering principles. We agree with Astoria that a reasonable reader of ordinary intelligence would not be misled into believing that Brand FX's utility bodies and toppers have no engineering whatsoever, but would instead interpret the statement as a general assertion regarding the superiority of Astoria's products.

■ We disagree, however, with Astoria's contention that the "built with substandard materials" statement is a nonactionable assertion of opinion. Although there may be some contexts in which reference to a product as "substandard" is mere opinion, this is not one of them. The types of materials Brand FX uses, as well as their quality and durability when compared to the materials used by Astoria and other manufacturers, are facts that can be verified. Further, the statement is juxtaposed against a statement that Astoria's products are built with quality materials to be long lasting and durable. Thus, given its context and verifiability, a reader of ordinary intelligence could perceive this statement as one of fact: that the materials Brand FX uses in manufacturing its utility bodies and toppers are of lesser quality than those typically used in the industry and, unlike Astoria's products, are not durable and will not last very long. Therefore, we hold that the Advertisement's statement that Brand FX's products are "built with sub-standard materials" is not mere opinion but is a statement of fact.

**45.** We address Astoria's objections to Finley's affidavit in section VI.

■ Further, Brand FX put on evidence that the statement is false. The affidavit of Finley, Brand FX's owner and vice president, lists the materials used in Brand FX's manufacturing process and explains why they are not substandard:

Brand FX only uses quality materials to build its fiberglass truck bodies. The major materials used in the manufacturing process are polyester resin, polyester gel coat, fiberglass chop strand mat, gun roving, steel and aluminum. Brand FX uses PVC foams of different density and thickness and coremat polyester mat as its core for the truck bodies. All materials used are above accepted industry standard quality. Brand FX does not use any used, damaged or surplus materials. All of the materials used by brand FX have to pass quality control.

This affidavit testimony is more than a scintilla of evidence that the Advertisement is literally false and is, therefore, sufficient to raise a fact issue regarding whether Astoria has violated the Lanham Act.[45]

### 3. False Advertising Injury

Astoria also argues that there is no evidence that Brand FX suffered an injury as a result of Astoria's false advertising. Astoria contends that Brand FX's evidence of damages—$4,213,000 "in unjust enrichment" based on Astoria's profits and $76,200 for corrective advertising—is insufficient to raise a material fact issue on the injury element of Brand FX's false advertising claim. This argument, however, conflates the injury requirement for a false advertising claim with the requirement that a plaintiff prove his actual damages in order to obtain relief.[46]

**46.** *See Logan,* 263 F.3d at 462; *see also Balance Dynamics Corp. v. Schmitt Indus., Inc.,* 204 F.3d 683, 689 (6th Cir.) (noting impor-

Brand FX has produced more than a scintilla of probative evidence from which a jury could infer that Brand FX has been or is likely to be injured as a result of the Advertisement. Because Brand FX presented evidence showing that the "Built with substandard materials" statement is literally false, we must assume that it actually misled consumers.[47] The summary judgment record further shows that Astoria and Brand FX are competitors and that the Advertisement disparaged the quality of Brand FX's product. From this evidence, a jury could infer that Brand FX was in some way injured or is likely to be injured as a result of the Advertisement. Therefore, the trial court properly denied summary judgment for Astoria on Brand FX's false advertising claim.[48] We overrule Astoria's eighth issue.

## V. TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS

Astoria also asserts that it was entitled to a no-evidence summary judgment on Brand FX's claim for tortious interference with prospective business relations. Brand FX claimed that the following acts by Astoria constituted tortious interference with Brand FX's prospective business relations and caused Brand FX damages:

Astoria's use of Brand FX's confidential design drawings, trade dress infringement and publication of false informa-tion to third parties.... These acts are independently tortious and wrongful inasmuch as Astoria has unlawfully gained access to and used Brand FX's confidential design drawings, infringed upon Brand FX's trade dress and published disparaging words to third parties about Brand FX's economic interests, which words were false and were published with malice and without privilege.

. . . .

Brand FX has been damaged as a proximate result of Astoria's conduct, including damages in the form of lost profits. But for Astoria's unlawful conduct, Brand FX would have entered into a business relationship with, or obtained more business from ... Cook's Pest Control[.]

To prevail on a claim for tortious interference with prospective business relations, a plaintiff must show (1) a reasonable probability that the plaintiff and a third party would have entered into a contractual relationship;[49] (2) that an independently tortious or wrongful act by the defendant prevented the relationship from occurring;[50] (3) that the defendant did the act with a conscious desire to prevent the relationship from occurring or knew that the interference was certain or substantially certain to occur as a result of the conduct;[51] and (4) that the plaintiff incurred actual harm or damage as a result of the

tance of "clearly distinguishing the elements necessary to prove a breach of the Lanham Act from the elements necessary to justify a certain remedy for that breach"), *cert. denied*, 531 U.S. 927, 121 S.Ct. 306, 148 L.Ed.2d 245 (2000).

47. *See Pizza Hut Inc.*, 227 F.3d at 497.

48. *See Moore*, 981 S.W.2d at 269 (holding that a no-evidence summary judgment is not proper if the nonmovant brings forward more than

a scintilla of probative evidence that raises a genuine issue of material fact).

49. *Ash*, 54 S.W.3d at 413–14.

50. *Wal–Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 726 (Tex.2001).

51. *Bradford v. Vento*, 48 S.W.3d 749, 757 (Tex.2001); RESTATEMENT (SECOND) OF TORTS § 766B cmt. d (1979).

defendant's interference.[52]

## A. Interference With a Business Relationship

In its fourth issue, Astoria contends that there is no evidence that it interfered with Brand FX's business relationship with prospective customers.[53] Astoria argues that Brand FX complains only that Astoria took some of Brand FX's business from a single, *existing* customer, Cook's Pest Control, Inc.

■■■ The types of business relationships protected against interference include continuing business relationships.[54] Therefore, we must review the summary judgment evidence regarding Astoria's alleged interference with Brand FX and Cook's relationship because such interference would support a tortious interference claim. That evidence is as follows:

Sam Alfano, the director of finance and accounting for Cook's, testified at his deposition that Cook's began doing business with Fibre Body Industries (FBI), Brand FX's predecessor, in the fall of 1999. Cook's had some problems getting FBI to resolve repair or replacement part problems satisfactorily, and after FBI filed for bankruptcy protection and Brand FX took over FBI's business, Brand FX refused to honor FBI's product warranties. Cook's also had a business relationship with Brand FX. Cook's had purchased ten of Brand FX's toppers and continued to purchase parts from Brand FX. But Cook's also experienced "a host of problems" with Brand FX's toppers.[55] As a result of these things, Alfano felt that Cook's needed "an alternative" to doing business with FBI or Brand FX.

At some point during or after these events, Astoria sought Cook's business.[56] Cook's wanted stair-step toppers on all of its trucks so that its fleet would have a consistent, professional look. Alfano was not aware of any company besides FBI and Brand FX that offered a stair-step roof line on its topper. Consequently, Cook's provided Astoria design drawings for a stair-step topper that FBI had provided Cook's, as well as a topper that Cook's had purchased from FBI. Astoria then manufactured stair-step toppers for Cook's, which were delivered in late 2002 or early 2003. After receiving these toppers, Cook's informed Brand FX that it was not going to purchase any more toppers from Brand FX.

We hold that this evidence would enable reasonable and fair-minded people to reach different conclusions regarding whether it was reasonably probable that Cook's would have continued to purchase toppers from

---

52. *Ash,* 54 S.W.3d at 414; *Scott v. Galusha,* 890 S.W.2d 945, 951 (Tex.App.-Fort Worth 1994, writ denied).

53. *See Ash,* 54 S.W.3d at 413.

54. *Heil–Quaker Corp. v. Mischer Corp.,* 863 S.W.2d 210, 214 (Tex.App.-Houston [14th Dist.] 1993), *writ granted, judgm't vacated w.r.m.,* 877 S.W.2d 300 (Tex.1994); *see* RESTATEMENT (SECOND) OF TORTS § 766B cmts. a, c (stating that the types of business relations protected are business relations that have not yet been reduced to a contract and continuing business or other customary relationships not amounting to a formal contract).

55. For example, some of the interior shelving in the toppers was the wrong size, mounting holes were not predrilled, and there was no weather stripping around the doors.

56. There is conflicting evidence concerning whether Astoria sought Cook's business. Alfano testified at his deposition that he believed Astoria had sent Cook's a cold-call email. Robert J. Wolf, Astoria's chief executive officer, testified at his deposition that Cook's "came to us."

Brand FX if Astoria had not been able to manufacture a stair-step topper so that Cook's truck fleet could retain its uniform appearance.[57] Thus, there is more than a scintilla of evidence to support the first element of Brand FX's tortious interference claim. Accordingly, we overrule Astoria's fourth issue.

## B. Independently Tortious Conduct: Trade Secret Misappropriation

In its fifth issue, Astoria contends that it was entitled to summary judgment on Brand FX's tortious interference claim because there is no evidence that Astoria's production of the replica stair-step topper constituted an independently tortious or wrongful act. Brand FX contends that Astoria's use of FBI's and Brand FX's design drawings to create a stair-step topper for Cook's was independently tortious on several grounds, including trade secret misappropriation. Astoria contends there is no evidence that its conduct constituted trade secret misappropriation.

 "Independently tortious" does not mean that the plaintiff must be able to prove an independent tort.[58] Rather, it means only that the plaintiff must prove that the defendant's conduct would be actionable under a recognized tort.[59] Conduct that is merely "sharp" or unfair is not actionable and cannot be the basis for an action for tortious interference with prospective relations.[60]

### 1. Evidence of a Trade Secret

 Generally speaking, a trade secret is any formula, pattern, device, or compilation of information that is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it.[61] Before information can be termed a trade secret, there must be a substantial element of secrecy.[62]

 To determine whether a trade secret exists, Texas courts apply a six-factor test: (1) the extent to which the information is known outside the business of the entity claiming the trade secret; (2) the extent to which it was known by employees and others involved in the business; (3) the extent of the measures taken by the entity to guard the secrecy of the information; (4) the value of the information to the entity and its competitors; (5)

---

**57.** See Ford Motor Co. v. Ridgway, 135 S.W.3d 598, 601 (Tex.2004) (holding that more than a scintilla of evidence exists if the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions).

**58.** Wal–Mart Stores, Inc., 52 S.W.3d at 726.

**59.** Id. In Wal–Mart Stores, Inc., the supreme court gave the following, nonexhaustive list of examples to illustrate what conduct can constitute tortious interference with prospective relations:

> [A] plaintiff may recover for tortious interference from a defendant who makes fraudulent statements about the plaintiff to a third person without proving that the third person was actually defrauded. If, on the other hand, the defendant's statements are not intended to deceive, ... then they are

not actionable. Likewise, a plaintiff may recover for tortious interference from a defendant who threatens a person with physical harm if he does business with the plaintiff. The plaintiff need prove only that the defendant's conduct toward the prospective customer would constitute assault. Also, a plaintiff could recover for tortious interference by showing an illegal boycott, although a plaintiff could not recover against a defendant whose persuasion of others not to deal with the plaintiff was lawful.

Id.

**60.** Id.

**61.** Computer Assocs. Int'l, Inc. v. Altai, Inc., 918 S.W.2d 453, 455 (Tex.1996).

**62.** Sands v. Estate of Buys, 160 S.W.3d 684, 687 (Tex.App.-Fort Worth 2005, no pet.).

the amount of effort or money expended by the entity in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.[63] These factors are relevant, but not dispositive, criteria because "[i]t is not possible to state precise criteria for determining the existence of a trade secret."[64] Because all trade secrets are different, one or more of these six factors may not apply. Therefore, it is not necessary to satisfy all six factors in every case to prove that a trade secret exists.[65] Moreover, other circumstances that are not included in the six factors may be relevant to the trade secret analysis. Accordingly, we weigh the factors in the context of the surrounding circumstances to determine whether a trade secret exists.[66]

We will first apply the six-factor test to determine whether there is some evidence that the design drawings are a trade secret. Evidence of four of these factors in this case is as follows:[67]

**Extent to which the information was known outside Brand FX's business.** Alfano testified at his deposition that FBI or Brand FX were the only sources of the design drawings that he was aware of. Thus, the evidence shows that FBI and Brand FX were the only source of the drawings.

**Extent of the measures taken to guard the secrecy of the information.** The evidence further shows that FBI did not provide the drawings to competitors or even to customers, unless they knew or were advised that the drawings were to be kept confidential. Finley stated in his affidavit that FBI made the drawings for the stair-step topper under his direction and that he considered them confidential. During the time he owned or operated FBI from the 1980s through April 2000,[68] he did not provide the drawings to any competitor. Finley further stated that the drawings were shared only with customers who knew or were advised that the drawings were not to be disclosed to any competitor and that FBI considered the drawings confidential.

**The value of the information to Brand FX and its competitors.** There is evidence that the design drawings were valuable to Brand FX because they detailed how to make the stair-step design that was FBI's and Brand FX's standard topper and they contained specialized information regarding the interior topper configurations that FBI had designed specifically

---

63. *In re Bass,* 113 S.W.3d 735, 739 (Tex. 2003); *Sands,* 160 S.W.3d at 687–88.

64. *Bass,* 113 S.W.3d at 740 (quoting Restatement (Third) of Unfair Competition § 39 cmt. d (1995)).

65. *Id.*

66. *Id.*

67. There is no evidence regarding two of the factors: the extent to which the information was known by Brand FX's employees and others involved in the business; and the ease or difficulty with which the information could be properly acquired or duplicated by others.

68. Finley stated that he owned FBI until 1997, when he sold the company to an invest-

ment company called Dubin & Clark. Following the sale, Finley was employed by Dubin & Clark as FBI's president until April 2000. Because Cook's was given the design drawings sometime after it began doing business with FBI in the fall of 1999, it could have received them during this period. Finley further stated in his affidavit that he reacquired all of FBI's assets, including its intellectual property, in April 2002. There is no evidence that Dubin & Clark did not attempt to keep the drawings confidential after Finley resigned as president in April 2000, and a fact finder could reasonably infer that Finley continued to attempt to keep the design drawings confidential after reacquiring them in 2002.

for Cook's. FBI and its successor, Brand FX, were the only companies that offered a stair-step topper roof line like Cook's wanted [69] or that had design drawings for such a topper. Alfano testified that Cook's used two FBI stair-step toppers, and the difference between them was the internal shelving configuration that FBI had designed.

In addition, there is evidence that the drawings were valuable to Astoria because it wanted to develop a stair-step topper to compete with Brand FX for Cook's business. According to Alfano, Cook's liked the interior topper configuration that FBI had designed, and Cook's had rejected Astoria's proposed design concepts for the topper interiors. Thole, Astoria's chief engineer, testified at his deposition that he had relied on FBI's design drawings to make sure that he incorporated the changes to the topper interiors that Alfano wanted.

**The amount of effort or money expended by FBI or Brand FX in developing the information.** There is evidence that FBI had invested considerable resources to acquire and develop the design drawings. Finley stated in his affidavit that, while he owned FBI, he acquired a company called Northwest Bodies, Inc. that manufactured a topper with a stair-step design. Finley stated that, following this acquisition, he made the stair-step topper FBI's standard topper and had a set of design drawings developed for it. Alfano testified that FBI had also pre-

pared specialized design drawings for the interiors of Cook's stair-step toppers.

Examining all of this evidence in the light most favorable to Brand FX, the nonmovant,[70] we hold that there is more than a scintilla of evidence that the design drawings are a trade secret.[71]

### 2. Evidence of Misappropriation

We now consider whether there is evidence that Astoria misappropriated the design drawings. A person is liable for using a trade secret if he discovered the secret by improper means.[72] Improper means of acquiring another's trade secrets include theft, fraud, unauthorized interception of communications, inducement of or knowing participation in a breach of confidence, and other means either wrongful in themselves or wrongful under the circumstances of the case.[73]

In this case, there is evidence that Astoria sought Cook's business and asked Cook's for copies of the design drawings for the stair-step topper because Cook's wanted toppers of that design and there was no source for the drawings other than FBI or Brand FX. Although Alfano testified that no one at FBI had told him the drawings were confidential, Finley stated by affidavit that, if the drawings were shared with customers, they were told or knew that the drawings were confidential and were not to be disclosed to any competitor. Thole, Astoria's chief engineer, testified that he used the drawings and Alfano's notes on them to make sure that

---

69. Alfano testified that Cook's wanted all of its trucks to have stair-step toppers so that its fleet would have a consistent look.

70. *See Sudan,* 199 S.W.3d at 292.

71. *See Ford Motor Co.,* 135 S.W.3d at 601.

72. *Hyde Corp.,* 314 S.W.2d at 769; *Sands,* 160 S.W.3d at 687.

73. Restatement (Third) of Unfair Competition § 43 (1995); *see Hyde Corp.,* 314 S.W.2d at 769 (adopting Restatement of Torts § 757, the precedessor to Restatement (Third) of Unfair Competition §§ 39–45); *accord Mabrey v. SandStream, Inc.,* 124 S.W.3d 302, 310 n. 13 (Tex.App.-Fort Worth 2003, no pet.).

he incorporated the changes into the interior bin packages that Alfano wanted. Thole conceded that he felt "a little bit" strange or awkward having a copy of FBI's drawings, but he was not too concerned because the drawings were not marked confidential. Thole viewed the drawings as sales drawings of the type that Astoria would send out to its customers.

 Viewing this evidence in the light most favorable to Brand FX, we hold that it would enable reasonable and fair-minded people to reach different conclusions regarding whether Astoria misappropriated the design drawings because it discovered the drawings by improper means.[74]

## C. Evidence of Damages

Next, Astoria argues that there is no evidence that its alleged wrongful conduct in interfering with Brand FX's prospective business relations caused Brand FX damages or injury. Brand FX alleged that it had "been damaged as a proximate result of Astoria's conduct, including damages in the form of lost profits. But for Astoria's

unlawful conduct, Brand FX would have ... obtained more business from ... Cook's Pest Control[.]"[75]

Alfano and Daniel Jackson, Brand FX's expert, testified by deposition and affidavit, respectively, that Cook's had purchased ten toppers from Brand FX in June 2002. Jackson stated in his affidavit that Cook's had paid a total of $25,513.15 for the toppers. Jackson further stated that Brand FX's invoices for the toppers and its monthly income statements detailing the expenses and other costs related to the manufacture and sale of the toppers showed that Brand FX's average gross profit on a topper was roughly 39%.[76]

According to Jackson and Alfano, Brand FX did not sell any toppers to Cook's after June 2002.[77] Instead, Cook's bought stair-step toppers from Astoria that Astoria had manufactured for Cook's using Brand FX's design drawings. Jackson stated in his affidavit that purchase orders, invoices, and related documents produced by Brand FX, Astoria, and Cook's showed that Astoria sold Cook's 270 toppers between 2002

---

**74.** *See* Restatement (Third) of Unfair Competition § 43. Astoria argues that it did not improperly acquire or use the drawings because it could have obtained the same information by studying the actual stair-step topper that Cook's had provided Astoria or the Brand FX stair-step topper that was readily available in the marketplace. But the mere fact that knowledge of a product may be acquired through lawful means such as inspection, experimentation, and analysis does not preclude protection from those who would secure that knowledge by unfair means. *K & G Oil Tool & Serv. Co. v. G & G Fishing Tool Serv.*, 158 Tex. 594, 314 S.W.2d 782, 788, *cert. denied*, 358 U.S. 898, 79 S.Ct. 223, 3 L.Ed.2d 149 (1958). The question is not how could Astoria have secured the knowledge, but how did it? *Am. Derringer Corp.*, 924 S.W.2d at 777; *Brown v. Fowler*, 316 S.W.2d 111, 114 (Tex. Civ.App.-Fort Worth 1958, writ ref'd n.r.e.).

**75.** Astoria contends, and we have held, that Brand FX did not produce legally sufficient evidence that it lost sales as a result of the Advertisement. *See supra* section IV(B). Astoria's statements in the Advertisement are, however, just one of the bases of Brand FX's tortious interference claim. Therefore, we must consider whether Brand FX put on any evidence that Astoria engaged in other tortious conduct that resulted in actual harm or damage to Brand FX.

**76.** In the trial court, Astoria objected to Jackson's methodology for determining Brand FX's gross profits on the toppers "because there has been no showing establishing the reliability of the regression analysis that he performed." Astoria does not, however, challenge Jackson's methodology on appeal.

**77.** Alfano testified that Cook's did continue to purchase parts from Brand FX.

and 2005–2 in 2002, 173 in 2003, 89 in 2004, and 6 in 2005.

Examining this evidence in the light most favorable to Brand FX, we hold that it would enable reasonable and fair-minded people to reach different conclusions concerning whether Cook's would have bought additional toppers from Brand FX if Astoria had not been able to manufacture the look-alike stair-step topper. A fact finder could also reasonably infer from this evidence that Brand FX would have made a profit on each topper sold, and that, because Cook's did not buy *any* toppers from Brand FX after Astoria began manufacturing the look-alike topper, Brand FX lost profits for each topper that it did not sell to Cook's. Accordingly, there is more than a scintilla of evidence that Brand FX suffered damages as a result of Astoria's alleged tortious interference with Brand FX's prospective business relations.

Because there is more than a scintilla of evidence that Astoria interfered with Brand FX's business relationship with Cook's, that Astoria's conduct was independently tortious or wrongful, and that Brand FX suffered damages as a result, we hold that the trial court did not err by denying Astoria's motion for a no-evidence summary judgment on Brand FX's tortious interference claim. We overrule Astoria's fifth issue.[78]

## VI. OBJECTIONS TO FINLEY'S AFFIDAVIT

 In its tenth issue, Astoria complains that the trial court improperly overruled Astoria's objections to Finley's affidavit. Astoria asserts that Finley was not competent to testify as an expert, that his testimony would not be helpful to a jury, and that the testimony is not based on a reliable foundation. Astoria further asserts that Finley's affidavit testimony regarding whether the materials Brand FX uses to manufacture its products are of "accepted industry standard quality" is subjective and conclusory.

 To be competent summary judgment evidence, an affidavit must show affirmatively that the facts sought to be proven therein would be admissible in evidence at a conventional trial and that the affiant is competent to testify to the matters stated.[79] If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.[80] The expert's affidavit must be based on a reliable foundation.[81] Whether the expert's affidavit testimony is competent summary judgment evidence is a matter committed to the trial court's

---

**78.** In light of our holdings that our jurisdiction does not extend to the part of the trial court's order disposing of claims or defenses that do not implicate free speech and that Astoria was not entitled to summary judgment on Brand FX's tortious interference claim because a fact issue exists on the trade secret misappropriation element of that claim, we will not address the questions raised by Astoria in issues six and seven of whether Brand FX's common law misappropriation claim is preempted by federal patent law, or whether Astoria was entitled to summary judgment on

Brand FX's trade dress infringement claim because the design was functional. *See supra* at Section III(B); Tex.R.App. P. 47.1.

**79.** Tex.R. Civ. P. 166a(f); *Ryland Group, Inc. v. Hood,* 924 S.W.2d 120, 122 (Tex.1996).

**80.** Tex.R. Evid. 702; *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 556 (Tex. 1995).

**81.** *E.I. du Pont de Nemours & Co.,* 923 S.W.2d at 556.

discretion.[82]

In this case, Finley stated in his affidavit that he had been in the utility and service truck body industry for thirty-six years and had owned several companies that were in the business of manufacturing and selling fiberglass truck bodies. Finley further stated that he was the owner and vice president of Brand FX. Thus, Finley was qualified by his skill and experience to testify as an expert regarding the quality of the materials Brand FX and other companies used to manufacture utility bodies. Further, the average person is unfamiliar with the types and quality of such materials; therefore, Finley's testimony would assist the court, and the jury, respectively,[83] in determining whether the statement in the Advertisement that Brand FX's products are "built with sub-standard materials" is reasonably capable of defamatory meaning and actually false. Moreover, Finley's affidavit provides a reliable foundation for his opinion that the "built with sub-standard materials" statement is false. The affidavit details the materials Brand FX uses in the manufacturing process and states that they are above accepted industry standard because they must pass quality control and are not used, damaged, or surplus materials. These averments are sufficiently clear and could have been

readily controverted.[84] Accordingly, we hold that the trial court did not abuse its discretion by denying Astoria's objections to Finley's affidavit testimony.[85] We overrule Astoria's tenth issue.

## VII. CONCLUSION

Having concluded that we have jurisdiction to review by interlocutory appeal only the portion of the trial court's order denying summary judgment on Brand FX's claims that Astoria challenged on free speech grounds, we dismiss Astoria's appeal except as it relates to Brand FX's business disparagement, false advertising, and tortious interference claims.[86] We reverse the trial court's order denying Astoria summary judgment on Brand FX's business disparagement claim and render judgment that Brand FX take nothing on that claim. We affirm the trial court's order denying Astoria summary judgment on Brand FX's false advertising and tortious interference with prospective business relations claims.

---

**82.** *United Blood Servs. v. Longoria,* 938 S.W.2d 29, 30 (Tex.1997).

**83.** A plaintiff ultimately must prove that the defendant published false, disparaging information about the plaintiff, *see Forbes Inc.,* 124 S.W.3d at 170, but whether the words used in a publication are reasonably capable of defamatory meaning is initially a question of law for the court to decide. *See Turner,* 38 S.W.3d at 114.

**84.** *See* Tex.R. Civ. P. 166a(c) (providing that expert testimony from an interested witness is competent summary judgment evidence if it is clear, positive, direct, otherwise credible and free from inconsistencies, and could have

been readily controverted); *Ryland Group, Inc.,* 924 S.W.2d at 122 (stating that conclusory affidavits are not enough to raise a fact issue because they are not credible or susceptible to being readily controverted).

**85.** *See United Blood Servs.,* 938 S.W.2d at 30.

**86.** *See Kaplan,* 69 S.W.3d at 217; *Markel v. World Flight, Inc.,* 938 S.W.2d 74, 78, 81 (Tex.App.-San Antonio 1996, no writ); *Prodeco Exploration, Inc. v. Ware,* 684 S.W.2d 199, 201 (Tex. App.-Houston [1st Dist.] 1984, no writ) (all addressing the parts of the respective appeals over which they had jurisdiction and dismissing the remainder of the appeals for want of jurisdiction).