Affirmed and Majority and Concurring
and Dissenting Opinions filed September 23, 2010.

 

In
The

Fourteenth
Court of Appeals



NO. 14-08-00536-CV



H. Frank
Faucette and J. Lawrence Schadler,
Appellants/Cross-Appellees 

v.

Grace C.
Chantos and A.J. Chantos & Associates, Inc. d/b/a Sarco of Texas, Appellees/Cross-Appellants 



On Appeal from
the 151st District Court

Harris County, Texas

Trial Court
Cause No. 2004-25975



 

MAJORITY OPINION

            This
case involves the failed sale of a company to its employees, who instead
resigned from the company, formed their own business, and obtained some of the
seller’s former lines of business.  The company, A. J. Chantos &
Associates, Inc., d/b/a Sarco of Texas (“Sarco”) and its principal shareholder,
Grace C. Chantos, sued former employees H. Frank Faucette and J. Lawrence
Schadler, alleging breach of contract, tortious interference with contract, and
other claims.  Both sides moved for summary judgment on the breach-of-contract
claim, and the trial court granted Chantos and Sarco’s motion for partial
summary judgment on liability for breach of contract.  

            The
case was then tried to a jury on damages for breach of contract and on the tortious-interference
claim.  The jury awarded Chantos $192,266.00 in damages for breach of contract. 
The jury found both defendants liable for tortious interference and awarded
Sarco $201,407.21 in damages.  The trial court granted Faucette and Schadler’s
motion for judgment notwithstanding the verdict on the tortious-interference
claim, but entered a judgment on the breach-of-contract claim for the amount
awarded by the jury, attorney’s fees, pre- and post-judgment interest, and
costs.

            On
appeal, appellants Faucette and Schadler contend the trial court erred in
granting Chantos and Sarco’s motion for partial summary judgment on the breach-of-contract
claim and in not granting their motion for summary judgment.  In resolving this
issue, we are asked to consider the infrequent circumstance of a grantor of an
option suing the holder of the option for allegedly breaching the option’s
terms.  The appellants also contend that the evidence at trial was legally and
factually insufficient to prove damages for breach of contract.

            On
cross-appeal, Chantos and Sarco contend that the trial court erred in granting Faucette
and Schadler’s motion for judgment notwithstanding the verdict because Chantos
and Sarco presented legally sufficient evidence of each element of tortious
interference.

            For
the reasons explained below, we affirm.

I

            Grace
Chantos and her husband, Andy, formed Sarco of Texas, a representative sales
agency for plumbing supplies, in 1979.  In 1983, they incorporated the agency
as A.J. Chantos & Associates, Inc., d/b/a Sarco of Texas.  Sarco had
contracts with manufacturers in the plumbing, air-conditioning, and heating
industry.  It was standard in the industry that the contracts with the
manufacturers had thirty-day termination provisions.  Despite the thirty-day
cancellation provision, Sarco represented several manufacturers for twenty
years or more.  These manufacturers included Elkay, Vanguard, McGuire, and
Precision.

            Grace
and Andy had two children, Linda and Andrew.  Andrew worked for Sarco until
1993, when he started his own agency, Sarco Central, in New Braunfels.  Linda
married Faucette, who worked for Sarco for a few years in the 1980s, returned
to Sarco as a salesman in 1994, and remained there until October 7, 2003.  J.
Lawrence Schadler worked as a salesman for Sarco from 1994 until October 7,
2003.  The only other sales employee for Sarco was Lane Malmburg, who started
with Sarco in 2002.  Malmburg resigned the same day as Faucette and
Schadler—October 7, 2003.  

            For
many years, Andy Chantos had suffered from a serious illness.  In 2001, he and
Grace began to consider retiring and entered into negotiations with Chumley
& Associates to sell the agency.  Ultimately, Andy and Grace broke off
negotiations with Chumley and offered to sell Sarco to Andrew, Faucette, and
Schadler.[1] 
Andrew already owned 260 of Sarco’s 1,000 shares, most of which were obtained
in 2001 when Sarco acquired Andrew’s company, Sarco Central.  In the spring and
summer of 2001, the parties executed the “Sale and Purchase Agreement”
containing the option to purchase all the shares of stock in Sarco (the
“contract”).  

            The
contract provided that, when Faucette, Schadler, and Andrew acquired forty-nine
percent of the company, they would have the option to purchase the remainder of
the company from Chantos.  The relevant portion of the contract provided:

At such time as Buyers have
acquired a total of forty-nine percent (49%) of the authorized and outstanding
shares of the Corporation, Buyers shall have the option to purchase the
remaining shares, but only in a lump sum wherein Buyers purchase all remaining
shares.

* * *

This Agreement shall terminate
unless the Sale and Purchase contemplated is completed in its entirety within
thirty-two (32) months from the date of execution of the Agreement.

            Andy
became gravely ill in late 2001, and after that he and Grace did not actively participate
in the operation of Sarco.  Faucette, Schadler, and Linda operated Sarco on a
day-to-day basis.  On August 18, 2002, Andy died.  Grace returned to work in
May of 2003, and Linda resigned.  

            On
July 22, 2003, Faucette, Schadler, Chantos, Andrew, and attorney Brad Walton
met to discuss exercising the option.  At the time of the meeting, Faucette
owned 118 of Sarco’s 1,000 shares; Schadler owned 116 shares, and Andrew owned
260 shares.  Thus, together they owned 494 shares, or 49.4 percent of the company.[2]  The
parties discussed a plan in which Faucette and Schadler were to purchase enough
shares from Chantos to bring their ownership to 260 shares each—the same number
Andrew already owned.[3]
 The company would then purchase the remaining shares.  The parties also
discussed having another meeting within sixty days, apparently to finalize the
agreement.  But no second meeting occurred, and Faucette and Schadler did not
purchase the shares. 

            Sometime
after the July 22 meeting, Faucette and Schadler’s business relationship with
Grace deteriorated, and after one particularly heated encounter with Grace,
they decided to leave Sarco and form their own representative agency.  In early
September, Faucette discussed leaving Sarco with Schadler and Malmburg.  They
all resigned on October 7, 2003.  About a week or two before they resigned,
Schadler went to some of the manufacturers with which Sarco had representative
contracts, including Elkay, Vanguard, McGuire, and Precision, and posed a
“hypothetical” question asking if he and the others left Sarco, whether they
could represent those manufacturers.  Also, in late September or early October,
Faucette spoke with an attorney about incorporating a new manufacturer’s
representative company to be called Tri-Rep Sales, Inc.  Faucette, Schadler,
and Malmburg did not inform Grace of their plans or that they were going to
quit.  They continued to represent to Grace and Andrew that they intended to
complete the purchase of shares in Sarco.

            On
the day Faucette, Schadler, and Malmburg resigned, Grace was in California. 
Consequently, the office was left without salespeople and unable to function
adequately.[4]
 That same day, Vanguard sent Sarco written notice that it was terminating its
manufacturer’s sales representative contract with the company.  Three days
later, on October 10, 2003, Elkay also terminated its sales agreement with
Sarco.  Elkay and Vanguard signed representation agreements with Tri-Rep
shortly after that.  Grace and Andrew were unable to find experienced salespeople
to staff the company, and Sarco was therefore unable to service its remaining
lines.  After Tri-Rep began operating, its annual sales ranged between $1
million and $3 million.

II

Breach
of the Option Contract

            Grace
and Sarco moved for partial summary judgment on their breach-of-contract
claim.  They alleged that, after Andy passed away, Faucette and Schadler
“concluded that it would be far less expensive to simply take the clients and
suppliers of [Sarco] rather than to continue with the purchase.”  They also
alleged that Faucette and Schadler persuaded several of Sarco’s largest
manufacturers and clients to leave Sarco and to sign representation contracts
with them.  Grace and Sarco contended that Faucette and Schadler breached the
option contract when, at the meeting on July 22, 2003, Faucette and Schadler
gave notice of their intent to exercise their option to purchase all of the
remaining shares of the company, but then failed to complete the purchase.  

            Faucette
and Schadler responded to this motion and filed their own motion for summary
judgment on the breach-of-contract claim.  In Faucette and Schadler’s motion
for summary judgment and response, they argued that they did not exercise the
option because they did not tender the funds to purchase the shares within the
time required by the contract.  Consequently, they argued, their failure to timely
exercise the option according to its terms legally amounted to nothing more
than a rejection of the option.  

            On
November 2, 2006, the trial court granted Grace and Sarco’s motion for partial
summary judgment.  Faucette and Schadler moved for reconsideration, which the
trial court denied.  

            In
their first issue, Faucette and Schadler contend that the trial court erred in
denying their motion for summary judgment on the breach-of-contract claim and
in granting Grace and Sarco’s motion.  

            We
review the trial court’s grant of summary judgment de novo.  Joe v. Two
Thirty Nine Joint Venture, 145 S.W.3d 150, 156–57 (Tex. 2004).  A movant
must establish its right to summary judgment by showing that no genuine issue
of material fact exists and that it is entitled to judgment as a matter of
law.  Nixon v. Mr. Prop. Mgmt Co., 690 S.W.2d 546, 548 (Tex. 1985).  We
take as true all evidence favorable to the non-movant, and we indulge every
reasonable inference and resolve any doubts in the non-movant’s favor.  Joe,
145 S.W.3d at 157. We review a summary judgment for evidence that would enable
reasonable and fair-minded jurors to differ in their conclusions.  Wal-Mart
Stores, Inc. v. Spates, 186 S.W.3d 566, 568 (Tex. 2006) (per curiam).  When
we review cross-motions for summary judgment, we consider both motions and
render the judgment that the trial court should have rendered.  Coastal
Liquids Transp., L.P. v. Harris County Appraisal Dist., 46 S.W.3d 880, 884
(Tex. 2001).

            It
is undisputed that, under the terms of the contract, Faucette and Schadler,
along with Andrew Chantos, acquired an option to compel Grace to sell the remaining
shares of Sarco on the stated terms before the option expired.  An option is a
privilege or right which the owner of property gives another to buy certain
property at a fixed price within a certain time.  State v. Clevenger,
384 S.W.2d 207, 210 (Tex. Civ. App.—Houston 1964, writ ref’d n.r.e.).  An
option contract has two components:  (1) an underlying contract that is not
binding until accepted and (2) a covenant to hold open to the optionee the
opportunity to accept.  Comeaux v. Suderman, 93 S.W.3d 215, 220 (Tex.
App.—Houston [14th Dist.] 2002, no pet.); Hott v. Pearcy/Christon, Inc,
663 S.W.2d 851, 853 (Tex. App.—Dallas 1983, writ ref’d n.r.e.).  

            In their motion for partial
summary judgment, Grace and Sarco contended that in the meeting on July 22,
2003, Faucette and Schadler committed to exercise their option to purchase the
remaining fifty-one percent of the Sarco shares and agreed that they would make
financial arrangements to purchase the shares.  Among other things, Grace and
Sarco supported their motion with the following testimony from Faucette’s
deposition:

Q.  During that [July 22] meeting
did you state that you were ready, willing and able to go forward with the deal
to purchase the remaining 51 percent in conjunction with - - 

A.  I believe we did.

Q.  - - and that would have been in
conjunction with Andrew C. Chantos and Lawrence - -

A.  Correct.

Q.  - - Schadler.

And you told Grace you were going
to go forward with the deal?

 

A.  I
believe I did.

 

Grace and Sarco also pointed to similar
excerpts of both Faucette’s and Schadler’s testimony in which they confirmed
that they agreed to exercise the option to purchase the remaining fifty-one
percent of the corporation and discussed how they would finance the purchases. 
Based on Faucette and Schadler’s testimony, Grace and Sarco contended that
Faucette and Schadler committed to exercise the option to purchase the
remaining shares of the company and specifically worked out the details of how
the purchase was to be made, including seeking financing.  But rather than
complete the sale, Faucette and Schadler breached their contractual obligation
by failing and refusing to carry through with their agreement to purchase the
remaining shares of stock.  

            On
appeal, Faucette and Schadler argue that the option is not enforceable because
their alleged acceptance varied materially from the option described in the
contract.  They also contend that their alleged acceptance was, at best, a
statement of intent to purchase shares sometime in the future, and the sale was
not completed by the deadline specified in the contract.  Generally, acceptance
of an option must be unqualified, unambiguous, and strictly in accordance with
the terms of the agreement.  Comeaux, 93 S.W.3d at 220; Crown Const.
Co. v. Huddleston, 961 S.W.2d 552, 558 (Tex. App.—San Antonio 1997, no
writ).  A conditional acceptance of an offer is generally considered a
rejection and counteroffer.  See United Concrete Pipe Corp. v. Spin-Line Co.,
430 S.W.2d 360, 363–64 (Tex. 1968); Hutcherson v. Cronin, 426 S.W.2d
638, 641 (Tex. Civ. App.—Tyler 1968, no writ).  But that does not mean the
parties to an option cannot modify the option or the terms of the underlying
sale by mutual agreement.  See Humble Oil & Refining Co. v. Westside
Inv. Corp, 428 SW.2d 92, 94–95 (Tex. 1968); Wall v. Trinity Sand &
Gravel Co., 369 S.W.2d 315, 317 (Tex. 1963).  

            Faucette
and Schadler argue that their alleged acceptance varied materially from the
option contained in the contract because the parties’ agreement was changed. 
Specifically, at the July 22 meeting, Faucette and Schadler expressed an intent
only to purchase enough shares from Grace so that they would each own 260
shares, the same number as held by Andrew Chantos.  Conversely, the offer
contained in the contract provided that the “Buyers” shall have the option to
purchase the remaining shares, “but only in a lump sum wherein Buyers purchase
all remaining shares.”  The “Buyers” are defined in the contract as Andrew C.
Chantos, H. Frank Faucette, and J. Lawrence Schadler.  Thus, Faucette and
Schadler argue, the option called for three buyers, Andrew, Faucette, and
Schadler, to make a lump-sum purchase of fifty-one percent of the shares of
stock in Sarco.  But the summary-judgment evidence showed that the alleged
acceptance called for Faucette to purchase 142 shares, Schadler to purchase 144
shares, Andrew to purchase nothing, and Sarco itself to purchase the remaining
220 shares.[5]
 Consequently, they contend, their alleged acceptance amounted to nothing more
than a counteroffer and rejection of the option contained in the contract.  See
Antonini v. Harris County Appraisal Dist., 999 S.W.2d 608, 610–11 (Tex.
App.—Houston [14th Dist.] 1999, no pet.) (“Acceptance must be identical with
the offer in order to make a binding contract.”).

            It
is undisputed that Grace owned fifty-one percent of the company’s shares, her
son Andrew owned twenty-six percent of the shares, and Faucette and Schadler
owned the rest.  The summary-judgment evidence shows that at the July 22
meeting, Faucette and Schadler agreed to exercise the option to purchase Grace’s
shares.  That Andrew, one of the “Buyers” defined in the contract, was not
purchasing any additional shares does not raise an inference defeating summary
judgment.  The intended purpose of the option was to enable the majority
shareholders (now Grace) to relinquish ownership of the company to the other
shareholders (Andrew, Faucette, and Schadler) once they acquired forty-nine
percent of the company.  The evidence conclusively shows that the parties
expressed an agreement consistent with this purpose.  The arrangement to
equalize the share ownership and to have the company itself buy the remaining
shares merely goes to the manner in which the other shareholders would
accomplish the agreed-upon purpose of buying out Grace’s ownership interest.  On
these facts, therefore, there was no counteroffer and rejection that rendered
the agreement unenforceable. 

            Faucette
and Schadler argue, however, that the alleged acceptance was not made in the
manner or within the time the contract required.  They point to the contract’s
provision that the option requires the buyers to “purchase” all of the
remaining shares and to do so “only in a lump sum.”  Therefore, they contend,
the contract required them to actually tender performance, not merely to
announce an intent to perform without ever tendering any money.  As additional
support for their interpretation of the contract, Faucette and Schadler point
to the “Term of Agreement” provision, which states that the contract “shall
terminate unless the Sale and Purchase contemplated in its entirety within
thirty-two (32) months from the date of execution of the Agreement.”  This
language, they contend, requires that actual payment be made prior to the end
of thirty-two months to exercise the option.  Thus, their mere statements at
the July 22 meeting that they were ready to purchase some of Grace’s stock were
not sufficient to accept the option.

            In
their motion, Grace and Sarco relied on a line of cases holding that unless an
option to purchase contains provision to the contrary, the optionee is only
required to notify the optionor prior to the expiration of the option period,
and then tender performance within a reasonable time thereafter to exercise the
option.  See, e.g., English v. English, 44 S.W.3d 102 (Tex.
App.—Houston [14th Dist.] 2001, no pet.); Maxwell v. Lake, 674 S.W.2d
795, 798 (Tex. App.—Dallas 1984, no writ); San Antonio Joint Stock Land Bank
v. Malcher, 164 S.W.2d 197, 200 (Tex. Civ. App.—San Antonio 1942, writ
ref’d w.o.m.).  In English, for example, an ex-wife notified her
ex-husband that she was exercising the option contained in the parties’ divorce
decree to buy out her ex-husband’s interest in their homestead within the
option period, but she did not complete the purchase before the option expired. 
Id. at 104.  This court held that “where the option instrument is silent
regarding the method of exercising the option, giving timely notice to the
optionor and subsequently tendering performance within a reasonable time is
sufficient to exercise the option.”  Id. (citing Maxwell v. Lake,
674 S.W.2d at 798).  Grace and Sarco argue that, because the option provision
of the contract did not specify the manner or method in which they were to be
notified that the option was accepted, Faucette’s and Schadler’s agreement to
purchase the remaining shares of stock at the July 22 meeting was sufficient to
exercise the option.

            On
appeal, Faucette and Schadler argue that these cases stand merely for the
proposition that unless the option provides otherwise, acceptance of the option
does not require the optionee to tender actual payment before the option
expires; they do not hold that an optionee may accept an option by mere notice
without ever tendering payment.  Thus, Faucette and Schadler contend, an
optionee who never tenders performance cannot enforce the option.  They also
argue that the option in this case does “provide otherwise” because it requires
the purchase be completed in its entirety according to its terms and within the
specified deadline.  In any event, they contend that because they never
tendered payment within the option period, they never exercised the option.  As
support, Faucette and Schadler cite Kruegel v. Berry, 75 Tex. 230, 9
S.W.863, 864–65 (1888), in which the supreme court concluded that a lessee who
had an option to purchase leased land for a specified amount within two years
“had the right at any time during the term of the lease . . . to purchase the
land by paying the consideration agreed upon,” but because he did not seek to
enforce the option before the expiration of the two-year period, and the land
was then sold to a third party, the lessee was not entitled to specific
performance of the option contained in the lease.  Kruegel did not
involve a situation in which the lessee gave notice of an intent to exercise
the option but failed to pay the consideration for the option within the option
period.  And, the court in Kruegel did not address whether acceptance
alone is insufficient to exercise an option.

In
this case, as in all option cases, the option contract itself is an offer by
the optionor to the optionee.  By agreeing to purchase the remaining shares at
the July 22 meeting—an arrangement that fulfilled the intended purpose of the
option—Faucette and Schadler elected to accept the offer.  The effect of this
election is the formation of a contract that binds both the optionor and the
optionee:

Election is the act of the
optionee which converts the option contract into a binding promise on the part
of the optionor to sell.  The effect of a timely and proper election under the
contract, and of a timely and proper acceptance of an offer, is the same, in
that the option contract, on the one hand, and the offer on the other, are
turned into a bilateral contract.  Having exercised the option by election
the optionee must then proceed to perform the conditions of the option contract
in order to complete the transaction.

 

Ferguson
v. Von Seggern, 434 S.W.2d 380, 385 (Tex. Civ.
App.—Dallas 1968, writ ref’d n.r.e.) (emphasis added); see also Hott,
663 S.W.2d at 854 (“When the optionee gives notice or otherwise complies with
the terms and conditions of the option . . . a bilateral executory contract is
formed, one party having the duty to convey and the other the duty to pay.”).  The
cases in which an optionee exercises the option and thus binds the optionor to
perform are legion.  See, e.g., Sinclair Refining Co. v. Allbritton,
147 Tex. 468, 218 S.W.2d 185, 188–90 (1949); Smith v. Hues, 540 S.W.2d
485, 490 (Tex. Civ. App.—Houston [14th Dist.] 1976, writ ref’d n.r.e.); Luccia
v. Ross, 274 S.W.3d 140, 149–50 (Tex. App.—Houston [1st Dist.] 2008, pet.
denied); Odum v. Sims, 609 S.W.2d 881, 882 (Tex. Civ. App.—San Antonio
1980, no writ); Kenver Corp. v. Robinson, 492 S.W.2d 317, 319–20 (Tex.
Civ. App.—Beaumont 1973, writ ref’d n.r.e.); Giblin v. Sudduth, 300
S.W.2d 330, 332–34 (Tex. Civ. App.—Austin 1957, writ ref’d n.r.e.); see also
El Paso Natural Gas Co. v. W. Bldg. Assocs., 675 F.2d 1135, 1139–41 (10th
Cir. 1982) (holding optionee’s acceptance of option without tender of purchase
price created mutually binding contract entitling optionee to specific
performance).  But the acceptance of an option ascribes contractual duties to
the optionee in the same way that it does the optionor.  By notifying Grace and
Sarco of their intent to exercise the option, Faucette and Schadler entered
into a bilateral contract and became obligated to perform.  See Ferguson,
434 S.W.2d at 385.  And when they failed to perform by refusing to complete the
purchase of the remaining shares, they breached the contract.

            Because
we affirm the trial court’s grant of summary judgment in favor of Grace and
Sarco, we do not address Faucette and Schadler’s competing motion for summary
judgment.

            We
overrule Faucette and Schadler’s first issue.  

Damages
for Breach of Option Contract

            In
their second issue, Faucette and Schadler contend that the evidence is legally
and factually insufficient to prove damages for breach of contract.  They argue
that Grace was awarded what she would have received from the sale of the
remaining shares of Sarco without any evidence of the value of the shares she
should have surrendered in the transaction.  According to Faucette and Schadler,
proper proof of damages required not only evidence of the amount Grace would
have received had the sale of the shares been performed, but also evidence of
the value of the shares she would have surrendered in the transaction.  See
Miga v. Jensen, 96 S.W.3d 207, 215 (Tex. 2002) (holding damage award resulting
from a breach of an agreement to purchase securities is the difference between
the contract price and the fair market value of the asset at the time of the
breach); Holt Atherton Indus. Inc. v. Heine, 835 S.W.2d 80, 84 (Tex.
1992) (evidence of lost income was legally insufficient to prove lost profits). 
They also argue there was undisputed evidence that she retained the shares,
sold assets of the company, and kept the proceeds for herself.[6]  

            When
examining a legal-sufficiency challenge, we review the evidence in the light
most favorable to the challenged finding and indulge very reasonable inference
that would support it.  City of Keller v. Wilson, 168 S.W.3d 802, 822
(Tex. 2005).  We credit favorable evidence if reasonable jurors could and
disregard contrary evidence unless reasonable jurors could not.  Id. at
827.  The evidence is legally sufficient if it would enable reasonable and
fair-minded people to reach the verdict under review.  Id. 

            When
examining a factual-sufficiency challenge, we consider and weigh all the
evidence, both supporting and contradicting the finding.  Mar. Overseas
Corp. v. Ellis, 971 S.W.2d 402, 406–07 (Tex. 1998).  We set aside the fact
finding only if it is so contrary to the overwhelming weight of the evidence as
to be clearly wrong and unjust.  Pool v. Ford Motor Co., 715 S.W.2d 629,
635 (Tex. 1986).

            Initially,
we note that the jury was asked to determine Grace’s damages for the breach of
contract the court had found.  The question was worded as follows:

            What sum of money, if any, if paid now in cash,
would fairly and reasonably compensate Grace C. Chantos for her damages, if
any, that resulted from such breach of contract? 

            Consider the following elements of damages, if
any, and none other:

            The amount Grace C. Chantos would have received
for the sale of her 502 shares of the business corporation if H. Frank Faucette
and J. Lawrence Schadler had not breached the Sale and Purchase Agreement.

At
the charge conference, Faucette’s and Schadler’s only objection to this
question was that the answers should have been separate for each of them.  They
did not complain that the instruction’s measure of damages was improper or
otherwise object to the instruction.  Therefore, we measure the sufficiency of
the evidence against the language in the charge.  Osterberg v. Peca, 12
S.W.3d 31, 55 (Tex. 2000) (holding, when no objection is made to jury issue,
sufficiency of the evidence is measured against charge given by court rather
than some other unidentified law); Kroger Co. v. Brown, 267 S.W.3d 320,
323 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (measuring sufficiency of
damages evidence against commonly understood meaning of undefined term used in
charge); see also Equistar Chems., L.P. v. Dresser-Rand Co., 240 S.W.3d
864, 868 (Tex. 2007) (holding argument that charge submitted improper measure
of damages was waived by failure to object in trial court); Tribble &
Stephens Co. v. Consolidated Services, Inc., 744 S.W.2d 945, 949 (Tex.
App.—San Antonio 1987, writ denied) (holding failure to raise issue of improper
measure of damages in trial court waived review of complaints that proper
measure of damages was not submitted to jury and that plaintiff failed to
present evidence on the proper measure).

            Here,
the jury was instructed that the measure of damages is the amount of money
Grace “would have received for the sale of her 502 shares” of the company had
Faucette and Schadler not breached the contract.  Under the terms of the
contract, the price per share was $383.  The jury awarded $192,266, which is
exactly the share price multiplied by 502.  Therefore, the jury’s answer is
supported by legally sufficient evidence.  And, although Faucette and Schadler
complain that Grace received a double recovery because she was awarded the
sales price while retaining the shares, the jury was not asked to determine
fair market value of the shares or to calculate Grace’s net profits on the sale
of the shares.  The evidence, measured against the question asked, is also
factually sufficient to support the jury’s award.

            Having
overruled Faucette and Schadler’s second issue, we next turn to Grace and
Sarco’s cross-appeal.

III

Tortious
Interference

            At
trial, the jury found Faucette and Schadler tortiously interfered with Sarco’s
manufacturers’ representative contracts with Elkay and Vanguard.  In a single
issue, Sarco contends the trial court erred in granting Faucette and Schadler’s
motion for JNOV on the tortious-interference findings because Sarco presented
legally sufficient evidence of each element of that cause of action.  

            A
trial court may disregard a jury’s verdict and render a judgment
notwithstanding the verdict if no evidence supports one or more of the jury’s
findings or if a directed verdict would have been proper.  Tiller v. McLure,
121 S.W.3d 709, 173 (Tex. 2003).  The final test for legal sufficiency is
whether the evidence at trial would enable reasonable and fair-minded people to
reach the verdict under review.  City of Keller v. Wilson, 168 S.W.3d
802, 827 (Tex. 2005).  To determine whether the trial court erred in rendering
a JNOV, we review the entire record, crediting favorable evidence if reasonable
jurors could and disregarding contrary evidence unless reasonable jurors could
not.  Id. at 807.

            To
prevail on a tortious-interference claim, Sarco was required to prove: (1)
contracts existed which were subject to Faucette and Schadler’s interference;
(2) Faucette and Schadler willfully and intentionally committed acts of
interference; (3) Faucette’s and Schadler’s acts proximately caused damages;
and (4) actual damages or loss occurred.  Browning-Ferris, Inc. v. Reyna,
865 S.W.2d 925, 926 (Tex. 1993); Rodarte v. Investeco Group, L.L.C., 299
S.W.3d 400, 411 (Tex. App.—Houston [14th Dist.] 2009, no pet.).  

            Sarco
argues that the evidence shows that Faucette and Schadler intentionally
destroyed Sarco’s business for their own financial gain.  Specifically, Faucette
and Schadler, while receiving salaries and bonuses from Sarco to enable them to
purchase the company and promising they were continuing with the purchase,
persuaded the manufacturers who had been with Sarco for over twenty years to
terminate their contracts so they could do business with Faucette and Schadler’s
new company, Tri-Rep.  Further, Faucette and Schadler planned their method of
departure from Sarco—resigning without notice when Grace was out of the state
and taking the only other salesman with them—knowing it would cause great harm
to Sarco.

            Faucette
and Schadler respond that Sarco’s claim is not one for tortious interference
with existing contracts, but is actually one for tortious interference
with prospective contracts.  They point out that Elkay and Vanguard
complied with their contracts, giving Sarco the contractually required thirty-day
notice of termination, and that Sarco continued to act as manufacturer’s representative
for those thirty days.  According to Faucette and Schadler, Sarco is actually seeking
to recover damages for the loss of the prospect that Elkay and Vanguard
would continue to renew the manufacturer’s representative contracts
indefinitely.  

            This
distinction is significant because in Wal-Mart
Stores, Inc. v. Sturges, 52 S.W.3d 711, 726
(Tex. 2001), our supreme court held that to prevail on a claim for tortious interference
with prospective contracts the plaintiff must additionally prove that the defendant’s conduct was “independently tortious or
wrongful.”  The Sturges court explained that conduct that is merely “sharp” or perceived as “unfair competition”
is not actionable as the basis for this tort.  Id.  The plaintiff is not
required to prove an independent tort; instead, the plaintiff
need only establish that the defendant’s conduct would be actionable under a
recognized tort.  Id. 

            Thus, after Sturges, the following formulation of the
elements of the tort has been adopted:

(1) a reasonable
probability that the parties would have entered into a contractual
relationship;

(2) an “independently tortious or unlawful” act by the
defendant that prevented the relationship from occurring;

(3) the defendant did such act with a conscious desire to
prevent the relationship from occurring or knew that the interference was
certain or substantially certain to occur as a result of his conduct; and

(4) the plaintiff
suffered actual harm or damage as a result of the defendant's interference.

See
Baty v. Protech Ins. Agency, 63 S.W.3d 841, 860 (Tex. App.—Houston [14th
Dist.] 2001, pet. denied.  Faucette and Schadler contend that Sarco does not
even attempt to meet the burden of showing independently tortious conduct.

            Sarco
contends that Sturges does not apply because its claims were brought for
tortious interference with existing contracts.  Sarco points out that that it
proved the existence of its contracts with the manufacturers and that Faucette
and Schadler deprived Sarco of the benefits of those contracts.  Sarco further
points out that under Texas law the terminable-on-notice or terminable-at-will status
of a contract is not a defense to an action for tortious interference.  See
Juliette Fowler Homes, Inc. v. Welch Assocs., Inc., 793 S.W.2d 660, 666
(Tex. 1990) (terminable-on-notice contract); Sterner v. Marathon Oil Co.,
767 S.W.2d 686, 689 (Tex. 1989) (terminable-at-will contract).  Both Juliette
Fowler Homes and Sterner instruct that “[u]ntil a contract is
terminated, it is valid and subsisting, and third persons are not free to
tortiously interfere with it.”  Juliette Fowler Homes, Inc., 793 S.W.2d
at 666; Sterner, 767 S.W.2d at 689 (citing Restatement (Second) of Torts § 766 cmt. g (1979)); see
also Knox v. Taylor, 992 S.W.2d 40, 57–58 (rejecting terminable-on-notice
status of contract as defense to tortious-interference-with-contract claim and
holding third party’s mailing of defamatory memo interfered with plaintiff’s
business relationship).  

            But
as to terminable-on-notice or terminable-at-will contracts, the protection Juliette
Fowler Homes and Sterner provide is somewhat limited.  The supreme
court has also instructed that a party cannot be liable for inducing another
party “to do what it had a right to do” under a contract.  ACS Investors,
Inc. v. Laughlin, 943 S.W.2d 426, 431 (Tex. 1997).  Thus, a third party is
prohibited from tortiously interfering with a terminable-on-notice or
terminable-at-will contract, but “merely inducing one of the parties to
exercise his right to terminate contractual relations after giving the required
notice does not necessarily constitute tortious interference with
contract under Texas law.”  Juliette Fowler Homes, Inc., 793 S.W.2d at
667.  Likewise, “harm that results only from lawful competition is not
compensable by the interference tort.”  Sturges, 52 S.W.3d at 727.

            In
this case, the jury was asked in separate questions whether Faucette and/or
Schadler “intentionally interfered with the manufacturer’s representative
contracts [Sarco] had” with Elkay and Vanguard.  The jury answered “yes” to
both.  But there was no evidence that either Elkay or Vanguard breached their
contracts with Sarco.  It was undisputed that Elkay and Vanguard gave thirty
days’ written notice of termination as their contracts provided, and Sarco did
not allege or show that Faucette and/or Schadler induced them to breach their
contracts with Sarco during the thirty-day termination period.  Sarco’s real
complaint below and on appeal is the loss of the continuing business
relationship with Elkay and Vanguard, two of its most profitable lines, which had
existed for over twenty years.

            This
court has recognized that tortious interference with prospective contractual
relations includes continuing business relations.  See Heil-Quaker
Corp. v. Mischer Corp., 863 S.W.2d 210, 214 (Tex. App.—Houston [14th Dist.]
1993), writ granted, judgm’t vacated w.r.m., 877 S.W.2d 300 (Tex.
1994).  In Heil-Quaker, the appellants argued there was no evidence to
support the jury finding of tortious interference with business relations
because the tortious interference alleged was directed to an existing contract
rather than a prospective contractual relationship.  Id. at 214.  The
court rejected this contention, stating that tortious interference with
business or prospective contractual relations concerns not only business
relations that have not yet been reduced to a contract but also continuing
business relations not amounting to a formal contract.  Id. (citing Restatement of Torts (Second) § 766B,
cmt. a, c (1979)).  

            More
recently, in an appeal from a summary judgment, the Fort Worth court of appeals
rejected a contention that a claim for tortious interference with prospective
relations could not apply to a complaint that business was taken from an
existing customer.  Astoria Indus. of Iowa, Inc. v. SNF, Inc., 223
S.W.3d 616, 633 (Tex. App.—Fort Worth 2007, pet. denied).  Citing Heil-Quaker
Corp., the court concluded that tortious interference with prospective
business relations includes tortious interference with continuing business
relationships.  Id.  The court then proceeded to review the summary-judgment
evidence concerning the defendant’s alleged interference with the plaintiff’s
existing customer, including whether there was no evidence that the defendant
engaged in independently tortious conduct.  See id. at 633–37.

            In
the context of at-will or terminable-on-notice contracts, the Restatement
provides further support for the conclusion that the loss of the contract due
to another’s tortious acts is properly considered tortious interference with
prospective, or continuing, business relations:

            One’s interest in a contract terminable at will
is primarily an interest in future relations between the parties, and he has no
legal assurance of them.  For this reason, an interference with this
interest is closely analogous to interference with prospective contractual
relations.  (See § 766B).

Restatement (Second) of Torts
§ 766 cmt. g (1979) (emphasis added).  Likewise, section 766B, the section applicable
to prospective contractual relations, includes “interferences with . . . the
opportunity of selling or buying land or chattels or services, and any other
relations leading to potentially profitable contracts.”  Id. § 766B cmt.
c.  The comments to this section explain that “[i]n many respects, a contract
terminable at will is closely analogous to the relationship covered by this
Section.”  Id.  

            We
conclude, therefore, that under the facts of this case, Sarco’s claim is
properly characterized as one for tortious interference with prospective
relations, rather than tortious interference with existing contracts.  We
further conclude that the jury questions, as written, were broad enough to
encompass this theory.   

            Because
we have concluded that Sarco’s claim is one for tortious interference with
prospective contracts, Sarco was required to demonstrate that, among other
things, Faucette and Schadler engaged in independently tortious or unlawful
acts that interfered with its business relations with Elkay and Vanguard.  See
Sturges, 52 S.W.3d at 726.[7] 
But Sarco does not assert that Faucette and Schadler engaged in any
independently tortious conduct.[8]  In the absence of any evidence to
support this element of the cause of action, we conclude the trial court did
not err in granting the JNOV.

            Sarco
contends, however, that it is not required to demonstrate that a contract was
breached to show actionable interference with contract relations.  Instead,
Sarco argues that a party may be liable for interference by actions that do not
necessarily induce a breach of contract but which injure persons so that they
are unable to perform a contract, destroy or damage property that is the
subject matter of a contract, or make performance of a contract “more burdensome,
difficult or impossible, or of less or no value to the one entitled to
performance.”  See Tippett v. Hart, 497 S.W.2d 606, 610 (Tex. Civ.
App.—Amarillo 1973), writ ref’d n.r.e, 501 S.W.2d 874 (Tex. 1973); Restatement (Second) of Torts § 766A. 
According to Sarco, Faucette and Schadler planned to resign without notice or
warning, in a manner and at a time when they knew it would harm Sarco, and took
Sarco’s only other salesperson with them, leaving the company unable to
continue its contracts with Elkay, Vanguard, and even its other lines, because
it no longer had a sales force.

            Sarco’s
argument fails, however, because it conflates distinct theories of tortious
interference in a way that is inconsistent with the jury questions and the
evidence.  Sarco’s authorities address the situation in which a plaintiff may
recover for tortious interference with the plaintiff’s performance of her own
contracts, not tortious interference with the other party to the contract’s
performance.  For example, in Tippett v. Hart, Hart sued Tippett for
allowing his cattle to graze on her land without her permission, causing her to
breach a contract she had with a governmental agency that prohibited grazing.  See
497 S.W.2d at 607–11.  Likewise, the Restatement (Second) of Torts section
766A, entitled “Intentional Interference with Another’s Performance of His Own
Contract,” provides as follows:

One who intentionally and improperly interferes with the
performance of a contract . . . between another and a third person, by
preventing the other from performing the contract or causing his performance to
be more expensive or burdensome, is subject to liability to the other for the
pecuniary loss resulting to him.

Restatement (Second) of Torts
§ 766A (1979).  Section 766A “is concerned only with the actor’s intentional
interference with the plaintiff’s performance of his own contract, either by
preventing that performance or making it more expensive or burdensome.”  Id.
cmt. a.  Further, “[i]t is to be contrasted with [section] 766, which states
the rule for the actor’s intentional interference with a third person’s
performance of his existing contract with the plaintiff” and section 766B,
which concerns “the actor’s intentional interference with the plaintiff’s
prospective contract relations.”  Id.  

            Here,
the jury was asked whether Faucette and Schadler tortiously interfered with
Sarco’s contracts with Elkay and Vanguard—not whether Faucette and Schadler
tortuously interfered with Sarco’s own performance of its contracts with Elkay
and Vanguard.  Even if we read the jury question broadly enough to encompass
this theory, there is no evidence that Faucette and Schadler tortiously
interfered by preventing Sarco from performing its contracts with Elkay and
Vanguard.  Elkay and Vanguard notified Sarco that they were exercising their
contractual rights to terminate their contracts on thirty days’ notice almost
immediately after Faucette’s and Schadler’s resignations, and Sarco points to
no evidence that Faucette’s and Schadler’s actions impaired or destroyed its
ability to perform its contracts with Elkay and Vanguard during the remaining
thirty days of each contract.  As previously discussed, Sarco’s real complaint
concerning Elkay and Vanguard is the loss of these two profitable lines of
business to Faucette and Schadler’s new company, Tri-Rep.  Further, to the
extent Sarco points to evidence that it was unable to conduct business after
Faucette and Schadler resigned, the jury was not asked whether Faucette and
Schadler interfered with Sarco’s ability to perform its own contractual
obligations to its remaining lines.   

            Therefore,
viewing the evidence in a light most favorable to the jury’s verdict, we hold
that the trial court did not err in granting Faucette and Schadler’s motion for
JNOV, and we overrule Sarco’s issue.




*
* *

            Having
overruled the parties’ issues on appeal and cross-appeal, we affirm the trial
court’s judgment.

 








                                                                                    

                                                                        /s/        Jeffrey
V. Brown

                                                                                    Justice

 

 

 

Panel consists of Justices Frost, Brown,
and Senior Justice Hudson* (Frost, J. concurring and dissenting).

 

*Senior Justice J. Harvey Hudson,
sitting by assignment.

 

 

 









[1]
Grace Chantos testified that the reason she and Andy broke off negotiations
with Chumley was because Chumley could not offer permanent employment to
Faucette and Schadler.





[2]
At trial, the testimony reflected that Schadler owned 120 shares, but we are
confined to the summary judgment record for purposes of the appellants’ first
issue.





[3]
Schadler testified that the reason the parties discussed equalizing the shares
was that Grace was concerned about Schadler and Faucette having more shares
than Andrew.  Andrew, however, testified that the change actually helped
Schadler and Faucette, who did not have to purchase as many shares.





[4]
Faucette and Schadler testified that they intended to work the entire week
after they resigned, but because Grace changed the locks they were unable to do
so.  Schadler also testified that they continued to take orders for Sarco from
Malmburg’s home for thirty days, and Sarco was paid the commissions on those
orders.





[5]
Faucette’s testimony included the following exchange:

Q.        So the plan was as
of this July 22 meeting, was for you, Lawrence Schadler and Andrew C. Chantos
to all equalize the number of shares you owned at 26 percent each and for Sarco
of Texas to purchase the remaining 22 percent.  Is that correct?

A.        I believe that is
correct.  

Schadler also confirmed this plan in the excerpts of
his testimony attached to Grace and Sarco’s motion.





[6]
Faucette and Schadler also complain that the judgment was erroneously rendered
jointly and severally against them for breach of contract.  They state in their
brief that even if they were required to exercise the option for the entire
option price, Grace was entitled, at most, to an award of $82,472 against
Faucette and $81,705 against Schadler.  But Faucette and Schadler do not
provide any argument or authority to support their contention that the trial
court erred in rendering a judgment against them jointly and severally;
therefore, it is waived.  See Tex. R. App. P. 38.1(i).





[7]
We acknowledge that there are cases in which the elements of tortious
interference with contracts was applied to the alleged loss of continuing
business relationships.  See, e.g, SP Midtown, LTD v. Urban Storage, L.P.,
No. 14-07-00717-CV, 2008 WL 1991747, *8–9 (Tex. App.—Houston [14th Dist.] May
8, 2008, pet. denied) (mem. op.); Anderson, Greenwood & Co. v. Martin,
44 S.W.3d 200, 218 (Tex. App.—Houston [14th Dist.] 2001, pet. denied).  But
these cases are distinguishable because the issue presented here was not
addressed.  





[8]
We note that an allegation that Faucette and Sarco breached a fiduciary duty
could have supplied the independently tortious conduct to support this
element.  See RenewData Corp. v. Strickler, No. 03-05-00273-CV, 2006 WL
504998, at *10–12 (Tex. App.—Austin Mar. 3, 2006, no pet) (mem. op.) (holding
former employee’s breach of fiduciary duties to employer satisfies the Sturges
prerequisites for a claim of tortious interference with prospective business
relations).  But Grace and Sarco did not plead, seek to demonstrate, or request
a jury question concerning whether Faucette and Chantos breached any fiduciary
duty to Sarco.