

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

No. 07-20-00093-CV

WESTERN MARKETING, INC. AND TODD PITTS, APPELLANTS

V.

AEG PETROLEUM, LLC, APPELLEE

On Appeal from the 251st District Court
Potter County, Texas
Trial Court No. 108927-C-CV, Honorable Ana Estevez, Presiding

January 6, 2021

## OPINION

Before QUINN, C.J., and PARKER, and HATCH,[1] JJ.

Interlocutory appeals involving the Texas Citizens Participation Act (TCPA) mimic a game of "whack-a-mole"; as soon as the court disposes of one, another pops up. And each leads down the tortuous winding TCPA mole-hole. The most recent to show its head concerns a suit initiated by AEG Petroleum, LLC, against Western Marketing, Inc. and its employee, Todd Pitts (Western). The former averred a plethora of causes of action against the latter. Each, though, arose from a soured business relationship resulting in

---

[1] Honorable Les Hatch, Judge, 237th District Court, sitting by assignment.

Western purportedly engaging in effort to harm AEG's business interests. The effort allegedly ranged from defaming or disparaging AEG and its products to forming a cabal bent on unlawfully restraining its trade. Western moved to dismiss the suit under § 27.001 *et. seq.* of the Texas Civil Practice and Remedies Code. The trial court denied the motion, resulting in the interlocutory appeal now before us. Through it, Pitts and his employer contend that the trial court erred in denying the motion. We reverse and dismiss in part.

*The Hole Opens*

The standard of review we apply and analytical journey in which we engage were recently discussed in *Mesquite Servs., LLC v. Std. E&S, LLC*, No. 07-19-00440-CV, 2020 Tex. App. LEXIS 7485, at *5–7 (Tex. App.—Amarillo Sept. 15, 2020, no pet.) (mem. op.), and *Casey v. Stevens*, 601 S.W.3d 919, 922–23 (Tex. App.—Amarillo 2020, no pet). Their reiteration is unnecessary.

*Turn One – Does the Act Apply?*

The first matter with which we deal is the question of whether AEG's claims are based on, related to, or in response to "a party's exercise of the right of free speech, right to petition, or right of association." TEX. CIV. PRAC. & REM. CODE ANN. § 27.003(a) (West 2020) (permitting a defendant to seek dismissal of a legal action based on, relating to, or responding to a party's exercise of the right of free speech, right to petition, or right of association). That is the key which opens the hole's cover, and Western has the responsibility of initially showing that AEG's suit fits the keyhole. Whether it does begins with AEG's live pleading. While pleadings, affidavits, and evidence proffered to the trial court may be considered, the allegations in one's pleadings depict the nature of the legal action. *See Hersh v. Tatum*, 526 S.W.3d 462, 467 (Tex. 2017). So, if it is clear from them that the action comes within the TCPA, then the defendant's burden is met. *Id.* And, the

2

nature of the suit is determined from a "holistic," as opposed to segmented, review of them. *See Adams v. Starside Custom Builders, LLC*, 547 S.W.3d 890, 897 (Tex. 2018) (stating that the action's nature is "based on a holistic review of the pleadings").

According to Western, AEG's claims arise from or relate to the right to petition because Pitts allegedly uttered "disparaging" remarks about it in an affidavit, which affidavit was executed to assist Chevron U.S.A., Inc. obtain an injunction against AEG. It is both right and wrong. For instance, AEG did mention in its pleading the Chevron suit and Pitts's effort to assist that endeavor by executing the affidavit. So, too did it aver that Pitts uttered falsehoods about AEG in his affidavit. Executing an affidavit as part of litigation has been held to fall within the TCPA's definition of the right to petition. *See Beving v. Beadles*, 563 S.W.3d 399, 405–06 (Tex. App.—Fort Worth 2018, pet. denied) (concluding that Beving's deposition and affidavit testimony provided in the underlying lawsuit constitute a communication made in a judicial proceeding and implicates an exercise of her right to petition). So, in some respect, in can be said that AEG's suit is in response to the exercise of the right to petition. On the other hand, other allegations within AEG's live pleading speak of objectionable falsehoods uttered to third parties before and after Chevron sued and Pitts executed his affidavit to assist that entity. In AEG's view, they too were slices of the overall pie or scheme baked by Western to disparage and rid itself of a competitor, i.e., AEG. Suing to redress tortious acts occurring before, after, and independent of the Chevron suit hardly constitutes a legal action responding to the right to petition evinced by Chevron's suit and Pitts's attempt to further it. So, again we say that Western is both right and wrong in positing that AEG's suit is in response to the exercise of a right to petition. And, this presents an interesting circumstance.

When a legal action is in response to actions both protected and unprotected under the TCPA, the entire suit is not subject to dismissal; only that part relating or responding to the protected action is. *Weller v. MonoCoque Diversified Interests, LLC*, No. 03-19-00127-CV, 2020 Tex. App. LEXIS 4871, at *12–13 (Tex. App.—Austin July 1, 2020, no pet.) (mem. op.); *Beving*, 563 S.W.3d at 409; *Walker v. Hartman*, 516 S.W.3d 71, 81 (Tex. App.—Beaumont 2017, pet. denied).  More importantly, it is the defendant's responsibility to segregate the protected conduct from the unprotected; if it cannot, then its motion to dismiss should be denied. *See White Nile Software, Inc. v. Carrington, Coleman, Sloman & Blumenthal, LLP*, No. 05-19-00780-CV, 2020 Tex. App. LEXIS 7097, at *14–15 (Tex. App.—Dallas Aug. 31, 2020, no pet.) (mem. op.); *Weller*, 2020 Tex. App. LEXIS 4871, at *12–13; *Beving*, 563 S.W.3d at 409.  In other words, if a particular cause of action arises from or relates to both protected and unprotected conduct and one cannot be segregated from the other, then denying the motion to dismiss that cause is the appropriate course of action.  That initially would seem to be the correct course of action here.  "Why?" one would ask.  Because, according to Western, AEG incorporated each factual allegation averred in the amended petition into each of its causes of action.  So, in its view, the Chevron suit and Pitts affidavit were part of each cause of action.  But, following that logic would mean that other purported misconduct undertaken by Western and independent of the Chevron suit and Pitts affidavit also comprise each cause of action.  So, the appropriate course of action would be to deny dismissal.  Oh, were it that we could escape the mole-hole and end our journey by relying on that analysis.  Sadly, we cannot for Western invoked another way to keep us underground.  It did so by also asserting that AEG's claims were based on, related to, or in response to the exercise of the right of free speech.  And, with that, we cannot disagree.

4

An "exercise of the right of free speech" consists of "a communication made in connection with a matter of public concern." TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(3) (West 2020); *Creative Oil & Gas, LLC v. Lona Hills Ranch, LLC*, 591 S.W.3d 127, 134 (Tex. 2019). Encompassed within "a matter of public concern" are communications related to "a good, product, or service in the marketplace." TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(7)(E); *Creative Oil & Gas, LLC*, 591 S.W.3d at 134. To fall within the TCPA, the communications must relate to a good, product, or service and "have some relevance to a public audience of potential buyers and sellers." *Creative Oil & Gas, LLC*, 591 S.W.3d at 134–35.

Referring back to the purported "scheme" initiated by Western, AEG described it as consisting of "entering into agreements with other petroleum product distributors to boycott AEG as a customer" and "disparaging AEG and/or its products to other petroleum product suppliers and AEG customers throughout the Texas Panhandle." One disparaging remark consisted of an allegation about AEG selling "counterfeit bulk lubricant products." It was made to SBJ Services, which entity happened to be a buyer of AEG's products. To another entity, that is, Hansford Supply, Pitts allegedly said such things as 1) AEG was "'selling counterfeit product," 2) Western "had trouble in the past with AEG," 3) "AEG are bad news," and 4) "any product that Hansford Supply buys from AEG might not be what [AEG] said it was." Hansford Supply also happened to be a customer of AEG, according to the pleadings.

Similarly, Western purportedly told Chevron that AEG was selling counterfeit products under the Chevron trademark. The statement was made, according to AEG, during a period in which Chevron actually manufactured some of the products AEG sold.

5

On another occasion, Western, through a supposed intermediary, allegedly approached a different AEG supplier, CITGO. The intermediary allegedly accused AEG of dealing in counterfeit products under CITGO's trademark or logo. Old World and Lubriformance were also told disparaging remarks by Pitts, which remarks concerned AEG products and its means of selling them.

Each of the foregoing averments relate to a good, product, or service of AEG. So too were the utterances said to either customers, suppliers, or potential suppliers of AEG. That they concerned counterfeiting the products of suppliers and selling those counterfeit products to customers makes it rather difficult to deny that the utterances carried some relevance to a public audience of potential buyers and sellers. The same is no less true of the statement told Old World in response to the latter's understanding that AEG was a "retailer with dozens of stores"; that implicated the means by which AEG obtained products from suppliers and sold them to customers. Thus, it can be said the communications fell within the penumbra of TCPA's provisions pertaining to the right of free speech. These communications also formed the basis for AEG's claims of defamation, business disparagement, Lanham Act violations, and interference with existing and prospective business relationships. It is also arguable that they formed aspects of AEG's allegations concerning restraint of trade.

Again, the company charged Western with engaging in an "anticompetitive scheme." According to AEG's live pleadings, it consisted of both "(a) entering into agreements with other petroleum product distributors to boycott AEG as a customer and (b) disparaging AEG and/or its products." Lubriformance was one member of the illegal boycotts, according to AEG. Its membership was evinced by the company telling AEG that it (Lubriformance) "'did not want to be a part of what [AEG] was trying to achieve.'"

6

This position was voiced after Lubriformance spoke with Western. While Lubriformance did "not explain . . . the reason for [its] abrupt change in attitude regarding AEG," it occurred because Western's "(a) . . . agreement with Lubriformance to boycott AEG as a customer and (b) the disparaging statements from Defendants concerning AEG." One could fairly read AEG as accusing, through its pleading, Lubriformance of joining the agreement after being induced to do so by hearing the disparagements.

The same can be said of Old World. AEG was about to acquire product from that company until the latter contacted Western, according to AEG. "Old World's abrupt 180° tum in selling to AEG was a direct result of (a) Defendants' agreement with Old World to boycott AEG and (b) Pitts' disparagement of AEG," as averred in the pleadings. Thus, one can fairly read the allegation as suggesting that Western induced Old World to join a boycott due to statements about AEG selling counterfeit products. And, that "anticompetitive scheme" formed the basis of AEG's first cause of action involving the restraint of trade and commerce.

As previously mentioned, the legal action need only be "based on or, relate[] to, or . . . in response to a party's exercise of the right of free speech." The requisite nexus need not be strong; a tenuous or remote one suffices. *See Grant v. Pivot Tech. Sols., Inc.*, 556 S.W.3d 865, 879–80 (Tex. App.—Austin 2018, pet. denied) (noting the Texas Supreme Court's rejection of the argument that the plain language of the phrase requires something more than a tenuous or remote relationship). That is, the claims relate to a protected communication when there is some sort of connection, reference, or relationship between them and are in response to one if they react to or are asserted subsequently to the communication. *Id.* at 880; *Cavin v. Abbott*, 545 S.W.3d 47, 69 (Tex. App.—Austin 2017, no pet.); *accord Fla. Metal Prods., Inc. v. Kreder*, No. 10-18-00383-

7

CV, 2020 Tex. App. LEXIS 8163, at *6–7 (Tex. App.—Waco Oct. 14, 2020, no pet.) (mem. op.) (stating the same). Each of AEG's claims have some sort of connection, reference, or relationship between them and the communications about AEG's products. Each is a reaction to or is asserted subsequently to the communications. Thus, each cause of action, including those sounding in antitrust, either "relate[] to" or is "in response to" communications within the umbrella of the TCPA.

*Exempted*

Although the causes of action relate to or are in response to communications, AEG nonetheless argues that the TCPA does not apply to them given the commercial speech exemption. The exemption appears in § 27.010 of the statute.[2] It applies only to certain communications related to a good, product, or service; those being "communications made not as a protected exercise of free speech by an individual but as 'commercial speech which does 'no more than propose a commercial transaction.'" *Castleman v. Internet Money Ltd.*, 546 S.W.3d 684, 690 (Tex. 2018) (per curiam); *see* TEX. CIV. PRAC. & REM. CODE ANN. § 27.010(b). Furthermore, the party asserting it has the burden to prove its applicability. *Forget About It, Inc. v. BioTE Med., LLC,* 585 S.W.3d 59, 68 (Tex. App.—Dallas 2019, pet. denied). Carrying this burden requires it to establish that 1) the defendant was primarily engaged in the business of selling or leasing goods, 2) the defendant uttered the statement or engaged in the conduct at issue in its capacity as a seller or lessor of those goods or services, 3) the statement or conduct at issue arose out of a commercial transaction involving the kind of goods or services the defendant

---

[2] According to the legislature, the Act "does not apply to a legal action brought against a person primarily engaged in the business of selling or leasing goods or services, if the statement or conduct arises out of the sale or lease of goods, services, or an insurance product, insurance services, or a commercial transaction in which the intended audience is an actual or potential buyer or customer." TEX. CIV. PRAC. & REM. CODE ANN. § 27.010(a)(2) (West 2020).

provided, and 4) the intended audience of the statement or conduct was actual or potential customers of the defendant for the kind of goods or services the defendant provided. *Castleman*, 546 S.W.3d at 688.

Upon considering the aforementioned elements in conjunction with AEG's multiple claims, we immediately see that the claim sounding in restraint of trade falls outside the exemption's scope. The "co-conspirators" in the alleged boycott underlying that allegation were Lubriformance and Old World. Neither of them was an actual or potential customer of Western. Rather, the converse is true; AEG was their potential buyer or customer. So, the fourth element of the *Castleman* commercial speech exemption was and is not satisfied *vis-à-vis* the comments to them. *UATP Mgmt., LLC v. Leap of Faith Adventures, LLC*, No. 02-19-00122-CV, 2020 Tex. App. LEXIS 8186, at *11–12 (Tex. App.—Fort Worth Oct. 15, 2020, no pet.) (mem. op.) (concluding that the fourth element was not satisfied because the communications were to the defendant's employees and suppliers). The same can be said of the disparagements told CITGO and Chevron. Those entities supplied or sold product to AEG; they did not acquire product or services from AEG, according to the averments in its live pleading.

As for SBJ and Hansford, they were customers of AEG. Various of the products they acquired from AEG were products which Western could and did sell. Yet, a problem allegedly exists regarding the disparagements allegedly uttered to Hansford. It concerns the representation by AEG that "Pitts and [Western] did not want Hansford Supply to purchase the Chevron bulk lubricant products from AEG and then compete with Gruver Farm Supply in the subsequent sale of these products to customers in the Hansford County area." In other words, Western sought not to sell a product to Hansford but rather to dissuade Hansford from buying a competitor's product and using it to compete against

9

a Western customer. Yet, it cannot be denied that Western and AEG competed with each other and sold similar or like products. And that Western did not sell product to Hansford directly or through an intermediary today did not mean Hansford could or would not be a customer tomorrow. This is especially so if AEG were displaced in the mind of Hansford as a vendor due to Western's utterances. Then, Western stood to profit as a substitute source of product.

Indeed, that the desire for economic profit underlay Western's actions directed at AEG is reasonably inferable from evidence of record. For instance, an August 2018 email from Pitts to a Chevron employee described his joining Frontier (an entity that sold Western product to others) to call on "a large account which AEG stole." In it, he sought assistance in gaining more favorable pricing to "pickup" the "account that was lost to AEG." Also within the record is an email sent by Pitts to Chevron representatives several months earlier wherein he complained of "our old friends at AEG . . . selling HDAX LA [a Chevron product] below our cost and causing all sorts of issues." So, he asked those Chevron representatives whether they "[c]an . . . help [him] on the comments to say something like neither of these samples are HDAX 3200 or 5200." In his view, '[s]omething like this would be very helpful." If nothing else, the email evinced Western's desire to rid it and its own customers of competition posed by AEG.

Our duty is to consider the pleadings and evidence in a light most favorable to the nonmovant when conducting a TCPA analysis. *Batra v. Covenant Health Sys.*, 562 S.W.3d 696, 708 (Tex. App.—Amarillo 2018, pet. denied). Applying that standard to the evidence at bar reveals conduct motivated by the desire for economic profit and undertaken by Western to enhance its own commercial opportunities in relation to a competitor. AEG was that competitor. The utterances made to Hansford and SBJ were

10

part of a plan to rid itself of competition, or so the evidence could be reasonably construed. In looking at the big picture and eschewing the invitation to compartmentalize the instances of purported tortious conduct in which Western engaged, we conclude that the alleged falsehoods in question resulted or arose from commercial transactions involving goods of the kind Western sold. *See Giri v. Estep*, No. 03-17-00759-CV, 2018 Tex. App. LEXIS 3162, at *11–12 (Tex. App.—Austin May 4, 2018, pet. denied) (mem. op.) (holding that a statement or conduct arises out of a commercial transaction involving the kind of goods or services the actor provides when the statement results, issues, proceeds, originates, or stems from that transaction); *see also Kassab v. Pohl*, No. 01-18-01143-CV, 2020 Tex. App. LEXIS 7560, at *14–15 (Tex. App.—Houston [1st Dist.] Sept. 17, 2020, no pet.) (mem. op.) (refusing to compartmentalize tortious conduct to avoid the commercial speech exemption but, rather, opting to consider the entirety of the "scheme" undertaken). So too did they satisfy the other *Castleman* prongs.

In sum, the commercial-speech exemption invoked by AEG was and is inapplicable to any utterances directed at Old World, Lubriformance, Chevron, and CITGO. It is applicable to those told Hansford and SBJ. Consequently, the latter are removed from further TCPA analysis, as are those portions of the causes of action dependent upon them. The former are not, and, in furthering our journey down the mole-hole, we now assess whether 1) AEG established a prima facie case for each claim founded upon them, TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(c) (West Supp. 2020) (stating that the court may not dismiss the legal action if the party bringing it establishes by clear and specific evidence a prima facie case for each essential element of the claim), or 2) Western established, by a preponderance of the evidence, a defense against those claims. *Id.* § 27.005(d) (requiring dismissal if the moving party establishes by a

11

preponderance of the evidence each essential element of a valid defense to the nonmovant's claim).

*Restraining Trade*

We turn now to the complaint about restraining trade. AEG alleged that Western violated § 15.05(a) of the Texas Business and Commerce Code. The latter makes "unlawful" "[e]very contract, combination, or conspiracy in restraint of trade." TEX. BUS. & COM. CODE ANN. § 15.05(a) (West 2011). Satisfying its terms requires proof of 1) a contract, combination, or conspiracy, 2) which is unreasonable, and 3) has an adverse effect on competition in the relevant market. *Brooks v. Excellence Mortg., Ltd.*, 486 S.W.3d 29, 40 (Tex. App.—San Antonio 2015, pet. denied) (op. on reh'g) (quoting *Marlin v. Robertson*, 307 S.W.3d 418 (Tex. App.—San Antonio 2009, no pet.)).

Contract, combination, or conspiracy implies some form of agreement or meeting of the minds between the parties. *See McAllen Hosps., L.P. v. Lopez*, 576 S.W.3d 389, 392 (Tex. 2019) (observing that contracts require the element of mutual agreement); *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 222 (Tex. 2017) (stating that an actionable conspiracy requires specific intent to agree to accomplish something and a meeting of the minds on the object or course to be accomplished); *Sacks v. Haden*, 266 S.W.3d 447, 450 (Tex. 2008) (per curiam) (stating that a meeting of the minds is necessary to form a contract). Indeed, AEG does not dispute this. Rather, it contends that the agreement need not be established with direct evidence; instead, circumstantial evidence may suffice. The circumstantial evidence cited us to illustrate that accord consisted of 1) AEG attempting to acquire product from Old World and Lubriformance, 2) the negotiations between the former and latter proceeding well, 3)

12

Western uttering statements to Old World and Lubriformance about AEG, and 4) Old World and Lubriformance opting not to do business with AEG.[3]

We have no quarrel with the proposition that an agreement may be illustrated through circumstantial evidence. Our quarrel lies with the proposition that opting to forgo business dealings with someone after being told falsehoods about the prospective client or customer is clear and specific evidence from which a rational fact-finder could reasonably infer an agreement to restrain trade. Those circumstances, even if construed in a light most favorable to AEG, depict no more than a rejection of AEG's overtures upon hearing Pitts's comments about it. When last we checked, potential sellers are free to select to whom they sell product in a capitalistic economic system. Engaging in "concerted action" with another is the first step to anti-trust. *See Editorial Caballero, S.A. de C.V. v. Playboy Enters., Inc.*, 359 S.W.3d 318, 337 (Tex. App.—Corpus Christi 2012, pet. denied) (stating that to show a violation of § 15.05 of the TFEAA, the complainants are "required to prove a concerted action by two or more persons"). Concerted action denotes ***jointly*** planning, arranging, or coordinating with the other person. *See Concerted Action*, BLACK'S LAW DICTIONARY (9th ed. 2009) (so defining "concerted action"). Indeed, if such joint effort at planning may be inferred from the mere circumstances alleged by AEG, then the absence of joint effort is equally inferable. One is not more likely than the other simply from evidence of hearing comments and rejecting a request to become a buyer. Both being equally inferable, then the evidence underlying each is evidence of neither. *See Muela v. Gomez*, 343 S.W.3d 491, 496 (Tex. App.—El Paso 2011, no pet.) (stating that when circumstantial evidence presents two equally

---

[3] In addressing the matter at trial and on appeal, AEG did not suggest that either Chevron or CITGO were party to an unlawful agreement. Its argument only encompassed Old World and Lubriformance. So, we construe the anti-trust claim to merely involve a purported arrangement between Western, Lubriformance, and Old World.

plausible, yet opposite, inferences, neither can be inferred); *accord KoKo Motel Inc. v. Mayo*, 91 S.W.3d 41, 48 (Tex. App.—Amarillo 2002, pet. denied) (stating that circumstantial evidence from which equally plausible but opposite inferences may be drawn is too speculative to support a verdict). Thus, we conclude that AEG failed to present clear and specific evidence establishing a prima facie case on the existence of an agreement or concerted action between Western, Old World, and/or Lubriformance for purposes of the § 15.05(a) claim.

*Conspiracy*

We further conclude that AEG failed to illustrate a prima facie case on each element of its conspiracy claim for the very same reason mentioned above. There can be no actionable civil conspiracy given that a prerequisite of same is existence of an agreement to accomplish a particular matter and a meeting of the minds on the object or course to be accomplished. *First United Pentecostal Church of Beaumont*, 514 S.W.3d at 222. Again, the evidence of a purported agreement consisted of Lubriformance and Old World indicating interest in selling product to AEG and ultimately choosing otherwise after allegedly communicating with Pitts. For the reason that those bits of evidence cannot serve as basis from which to reasonably infer an agreement for purposes of restraining trade, they neither can serve as basis from which to infer an agreement for purposes of conspiracy.

*Lanham Act*

The next cause of action arises under the Lanham Act, 15 U.S.C.A. § 1125(a). Both litigants represent that the elements to such a claim include a defendant's utterance of a false statement of fact about a product "in a commercial advertisement." *See ADB Interest, LLC v. Wallace*, 606 S.W.3d 413, 438 (Tex. App.—Houston [1st Dist.] 2020, pet.

14

filed) (indicating that to be an element of a particular Lanham claim and quoting *Astoria Indus. of Iowa, Inc. v. SNF, Inc.,* 223 S.W.3d 616, 629–30 (Tex. App.—Fort Worth 2007, pet. denied)).    We accept their representation for purposes of this appeal.    And, in accepting it, we note that a "commercial advertisement" consists of a representation that is 1) commercial speech, 2) made by the defendant who commercially competes with the plaintiff, 3) for the purpose of influencing consumers "'to buy the defendant's goods or services,'" and 4) is disseminated to the relevant purchasing public to constitute advertising or promotion within that industry.    *Id.* (quoting *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379 (5th Cir. 1996)).

In discussing earlier whether the commercial speech exemption applied to the allegation at bar, we found no evidence indicating that Western uttered the misrepresentations to Chevron, CITGO, Old World, or Lubriformance while attempting to sell its products.    The same is true here.    Utterances were purportedly made.    Missing though is evidence that either Lubriformance, Old World, CITGO, or Chevron were consumers of Western's products or that Western sought to influence them or any consumers to buy its products when the utterances were made.    *Seven-Up Co.*, 86 F.3d at 1384 (assessing whether a misrepresentation was uttered in an advertisement or promotion and observing that one issue before it was "whether Coca-Cola's presentation was made 'for the purpose of influencing consumers to buy defendant's goods'").    At most, Western allegedly was attempting to dissuade those entities from dealing with AEG, rather than attempting to induce them to buy its goods.    Thus, AEG failed to present a prima facie case on the element of "commercial advertisement."

*Defamation*

Next, we address the claim of defamation and turn to the falsehoods told Chevron. They were in an affidavit executed by Pitts after Chevron sued AEG, which affidavit was used by Chevron to obtain injunctive relief. Being uttered in that setting renders their use in a defamation suit problematic. Simply put, communications uttered in the due course of a judicial proceeding cannot serve as the basis of a civil action for libel or slander. *James v. Brown*, 637 S.W.2d 914, 916 (Tex. 1982) (per curiam); *IBP, Inc. v. Klumpe*, 101 S.W.3d 461, 470 (Tex. App.—Amarillo 2001, pet. denied). This is so because they are privileged, and that privilege encompasses "any statement made by the judge, jurors, counsel, parties or witnesses, and attaches to all aspects of the proceedings, including statements made in open court, pre-trial hearings, depositions, affidavits and any of the pleadings or other papers in the case." *James*, 637 S.W.2d at 916–17. The Pitts defamations appearing in an affidavit used in a lawsuit, therefore, are privileged and may not form the basis of a claim.

As for the defamations purportedly told CITGO, they must be attributable to Western for them to support a claim of defamation against that entity. *See Bedford v. Spassoff*, 520 S.W.3d 901, 904 (Tex. 2017) (per curiam) (noting the first element of a defamation claim to be that the "defendant" published a false statement). AEG attributed them to Western based "upon information and belief." What we were not told and could not find within the extensive record is the evidence underlying that "information and belief." To the extent factual allegations in an affidavit based on "information and belief" are not "factual proof" for purposes of summary judgment, *see Wells Fargo Constr. Co. v. Bank of Woodlake*, 645 S.W.2d 913, 914 (Tex. App—Texarkana 1983, no writ) (stating that affidavits based on information and belief are insufficient as verification by oath and

their content are not factual proof in a summary judgment proceeding), it is difficult to accept them as "factual proof" in a TCPA setting. *See RigUp, Inc. v. Sierra Hamilton, LLC*, No. 03-19-00399-CV, 2020 Tex. App. LEXIS 5376, at *14–15 (Tex. App.—Austin July 16, 2020, no pet.) (mem. op.) (noting the similarity between TCPA and summary judgment proceedings). Simply believing that something is true is not proof that it is true. If it were otherwise, then Martians did invade Earth in 1938 when many believed Orson Welles when he said so in a radio broadcast. *See Robert B. James, DDS, Inc. v. Elkins*, 553 S.W.3d 596, 608–09 (Tex. App.—San Antonio 2018, pet. denied) (stating that the "allegation about the insurance policy" "amounts to no evidence" because it "was based only 'on information and belief'"); *Whisenhunt v. Lippincott*, 474 S.W.3d 30, 46 n.17 (Tex. App.—Tyler Aug. 11, 2015, no pet.) (stating that the plaintiffs did not show actual damage or loss by clear and specific evidence through their allegation founded "upon information and belief").

Even if we were to assume that factual assertions based upon "information and belief" were somehow competent evidence, the allegations made here appear only in AEG's amended petition. Averments in a live pleading are not competent evidence sufficient to satisfy a nonmovants burden to illustrate a prima facie case, though. *See Buzbee v. Clear Channel Outdoor, LLC.*, No. 14-19-00512-CV, 2020 Tex. App. LEXIS 8867, at *26–27 (Tex. App.—Houston [14th Dist.] Nov. 17, 2020, no pet.) (mem. op.).

Clear and specific evidence establishing a prima facie case for each element of defamation is mandated by § 27.005(c) of the TCPA. An allegation based on "information and belief" is neither clear nor specific enough to clear that hurdle. *See Robert B. James, DDS, Inc.*, 553 S.W.3d at 608–09; *Whisenhunt*, 474 S.W.3d at 46 n.17. Consequently,

the supposedly false statement made to CITGO does not provide basis for a defamation claim against Western.

This leaves the utterances told to Old World and Lubriformance. The only evidence we found of the ones directed at Lubriformance were 1) "Todd and some of his customers [saying] that Wade [AEG] was selling Chevron bulk oil without being ok' d by Chevron to do so and Chevron was pursuing legal action," and 2) "when most people get a cease and desist letter from Chevron, they abide by it and Wade [AEG] was not." Apparently, the bulk oil was the Chevron product called "HDAX" but marketed through Western under Western's own label, "PC NGEO." AEG informed customers it was "HDAX," and apparently labelled it as "HDAX" on invoices. On appeal, Western did not expressly address whether the aforementioned utterances were false. Its effort was limited to attacking causation, that is, whether they caused AEG to suffer damages. Yet, AEG pled that the statements were defamatory per se. Statements that are so defamatory are presumed to "cause" reputational harm. *Burbage v. Burbage*, 447 S.W.3d 249, 259 (Tex. 2014) (so stating). Western did not argue otherwise or attempt to show on appeal that the statements were not defamatory per se. This omission has consequences since, "on appeal from the district court, it is the appellant's burden to show error." *Kuykendall v. City of San Antonio,* 360 S.W.3d 670, 673 (Tex. App.—El Paso 2012, no pet.). The limited nature of Western's appellate argument failed to do that. AEG need not have presented evidence of causation given the allegation of defamation per se. So, we must reject the only ground asserted by Western to defeat that claim relating to utterances told to Lubriformance.

Regarding the comments heard by Old World, the latter contemplated selling product to AEG because it thought AEG "was a retailer with dozens of stores." Pitts

18

informed the company that "AEG was not, in fact, a retailer." This purportedly was false information imparted by Western's employee. Western contends here that the statement was not false and AEG failed to offer competent evidence illustrating that it was damaged. AEG replied by citing to evidence that it sold its products to "end-user[s]" like SBJ. Presumably, the bit of evidence about selling to "end-user[s]" was enough to classify it a "retailer" and, thereby, illustrate Pitts's statement to be false, according to AEG.

Whether one saying another is "not a retailer" has a defamatory meaning is a question of law. *See Innovative Block of S. Tex., Ltd. v. Valley Builders Supply, Inc.,* 603 S.W.3d 409, 418 (Tex. 2020) (stating that whether a communication is defamatory is "in the first instance a legal question"). So, we review it de novo. *Bosque Disposal Sys., LLC v. Parker Cty. Appraisal Dist.,* 555 S.W.3d 92, 94 (Tex. 2018) (stating that questions of law are reviewed de novo). Furthermore, a statement is defamatory when it is reasonably capable of being construed as having a defamatory meaning, that is, a meaning which tends to diminish the plaintiff's reputation. *See Innovative Block of S. Tex., Ltd.*, 603 S.W.3d at 418–19. And, all that depends upon a reasonable person's perception of the entire publication, not just the individual statement. *Turner v. KTRK TV, Inc.*, 38 S.W.3d 103, 115 (Tex. 2000). So, the context of the statement is pertinent, and we must construe the publication as a whole in light of its surrounding circumstances based upon how a person of ordinary intelligence would perceive it. *D Magazine Partners, L.P. v. Rosenthal*, 529 S.W.3d 434 (Tex. 2017) (quoting *Turner*, 38 S.W.3d at 114).

Context is pertinent here. That context includes recognition that the participants in the conversation were members of a particular trade who engaged in wholesaling product to others. A reasonable person witnessing the conversation could not ignore that

circumstance. And, from Old World's perspective, given the evidence of record, it believed it was about to engage in a business relationship with a "retailer" having "dozens of stores." *See Retail, Retailer*, BLACK'S LAW DICTIONARY (9th ed. 2009) (defining "retail" as selling directly to the consumer through small quantities as opposed to bulk and "retailer" as a person or entity engaged in the business of selling personal property to public or consumers as opposed to selling to those who intend to resell the items). That too is a circumstance a reasonable person cannot ignore. Pitts's statement to Old World came in reply to and sought to correct that belief. Indeed, AEG's business may have included sales to "end-user[s]." Yet, it also included competing with Western by selling products for resale. More importantly, it practiced its business not through "dozens" of stores but only three locations, as evinced by its invoices. So, when placed in the context of Old World's belief and the surrounding evidence, we cannot say that a reasonable person viewing the totality of the circumstances would perceive Western's statement that AEG was "not a retailer" to having a defamatory meaning. A reasonable person could not perceive it as one tending to injure the subject's reputation, to expose him to public hatred, contempt, ridicule, or financial injury, or to impeach his honesty, integrity, or virtue. Simply put, the statement is substantially true when put in context.

*Business Disparagement*

Next, we address the claim of business disparagement and whether the statements outside the realm of commercial speech can serve as its foundation. The focus of the cause of action lies on recompensing pecuniary loss. *Innovative Block of S. Tex., Ltd.*, 603 S.W.3d at 417. The elements of the claim are 1) the existence of a false statement, 2) published with malice, 3) with the intent that it cause pecuniary loss or the

reasonable recognition that it will cause such loss, and 4) actual pecuniary loss, or special damages, resulting from it. *Id.*

The utterance to Old World is the first which we consider. Our having found it substantially true means it cannot serve as the basis for AEG's business disparagement claim. *See Delta Air Lines v. Norris*, 949 S.W.2d 422, 427 (Tex. App.—Waco 1997, writ denied) (concluding that because the statements made by Delta's representatives were not defamatory or were substantially true, they would not support recovery for business disparagement). As for that to Chevron and as explained earlier, it is privileged and non-actionable. Nor may the CITGO comment serve as basis for the claim since, as previously illustrated, AEG failed to present evidence supporting its attribution to Western.

That leaves the statement directed at Lubriformance. Among other things, Western again raises the element of causation. That is, it posits that AEG failed to present clear and specific evidence that any statement told Lubriformance caused the latter to forego dealing with AEG. Allegedly, "Lubriformance explained that the reason that it did not do business with AEG was unrelated to anything that Pitts told him, but rather was based on AEG's own actions." Such is borne out from the record.

The Lubriformance representative said "no" when asked by AEG if "anything . . . Pitts communicated to you, whether orally or in writing, influence[d] your decision on behalf of Lubriformance not to sell products to or otherwise do business with AEG?" When asked to explain why the company opted not to do business with AEG, the representative then replied: "I felt like Wade [AEG] was just trying to get me to say something negative about Western Marketing so he could use it later." That explanation mirrors the reason it gave AEG as to why it decided as it did, as illustrated by the following: "Wade had continued to bring up an incident where Pat Gomez was given a rebate check

21

in 2016. Because of this, I felt like all he was doing was trying to search for something to use against Western Marketing."

Other than alluding to one comment in Wade's affidavit, AEG cites us to nothing of record contradicting the reasons espoused by Lubriformance for its decision, and the Wade comment does not change that. Wade simply attested to being told that the Lubriformance representative said "'I do not want to be a part of what you are trying to achieve'" and Lubriformance "was not going to do business with me." To the extent one could infer that the "not want[ing] to be part of what [AEG was] trying to achieve" related to Pitts's statement that AEG was selling Chevron product without permission, one could also infer that it related to Lubriformance's belief that AEG merely wanted to find negative information to use against Western. As said in *Burbage,* a fact-finder may not reasonably infer an ultimate fact from meager circumstantial evidence giving rise to any number of inferences, none more probable than the other. *Burbage*, 447 S.W.3d at 262 (concluding that the jury could not reasonably infer that defamations at issue caused the cancellations when the cancellations could have occurred for any number of reasons). Here, the limited evidence before us suggests multiple reasons why Lubriformance decided to forgo dealing with AEG and none is no more likely than the other. So, the evidence is actually proof of neither. *See KoKo Motel, Inc.*, 91 S.W.3d at 48*.* Given this, AEG failed to present sufficient evidence establishing a causal link between the supposed disparagement and its alleged pecuniary loss. That also means it failed to carry its burden to establish a prima facie case on each element of business disparagement.

*Tortious Interference*

Now we turn to AEG's claims sounding in tortious interference. The first involves interference with contract. Elemental to that cause is an existing contract subject to

22

interference and proof that the defendant knowingly induced a party to the agreement to breach its obligations thereunder. *See Eagle Oil & Gas Co. v. TRO-X, L.P.*, 416 S.W.3d 137, 149 (Tex. App.—Eastland 2013, pet. denied); *All Am. Tel., Inc. v. USLD Commc'ns, Inc.*, 291 S.W.3d 518, 531–32 (Tex. App.—Fort Worth 2009, pet. denied); *accord El Paso Healthcare Sys.,Ltd. v. Murphy*, 518 S.W.3d 412, 421–22 (Tex. 2017) (stating that to prevail on a claim of tortious interference with an existing contract, Murphy had to produce evidence that El Paso Healthcare induced West Texas OB to breach the contract). AEG cited us to no evidence of any existing contract (oral or written) it had with a third party, with regard to which Western caused the third party to breach. Nor did we find any such evidence of record. Consequently, it failed to establish a prima facie case of tortious interference with contract.[4]

Next, we address interference with "existing" business relationships. Western's attack against same is founded merely on the proposition that "Texas law does not recognize such a cause of action." AEG conceded the argument.[5] However, it then asserted that its causes of action actually sounded in interference with existing contracts and prospective business relationships. We already disposed of the claim regarding interference with existing contracts. That leaves for consideration the claim of interference with prospective business relationships.

---

[4] AEG argued that Western only attacked, on appeal, the element regarding the existence of a contract. One need only read Western's argument to realize that AEG is mistaken. In its appellant's brief, the litigant expressly stated that "[e]ven if the claim were read as a claim for tortious interference with existing contracts, it should still be dismissed because AEG did not offer clear and specific evidence *as to each element of that claim*." (Emphasis added). Given this, it is rather certain that Western placed each element of the cause of action into play on appeal.

[5] It stated in its appellees' brief: "As Appellants correctly point out (Br. at 42), 'Texas law recognizes two forms of tortious-interference claims: one based on interference with an existing contract and one based on interference with a prospective business relationship.' *El Paso Healthcare Sys., Ltd. v. Murphy*, 518 S.W.3d 412, 421 (Tex. 2017)."

23

Western limited its appellate argument about AEG's prospective business relationships to those with Old World, Lubriformance, SBJ, and Hansford. AEG's response here and reply to the motion to dismiss filed below mirrors that limited scope; the only third parties it expressly mentioned as being implicated within the prospective business relationships claim were the same parties encompassed by Western's appellate contentions. Because we concluded that the utterances to SBJ and Hansford fell within the commercial speech exemption, that leaves only Old World and Lubriformance and the statements told them.

To succeed upon a claim of interference with prospective business relationships, the complainant must establish 1) a reasonable probability that the plaintiff would have entered into a business relationship with a third party; 2) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; 3) the defendant's conduct was independently tortious or unlawful; 4) the interference proximately caused the plaintiff injury; and 5) the plaintiff suffered actual damage or loss as a result. *Coinmach Corp. v. Aspenwood Apt. Corp.*, 417 S.W.3d 909, 923 (Tex. 2013); *Batra*, 562 S.W.3d at 712. The first and fifth elements were placed in play in respect to Lubriformance. That is, Western believed AEG failed to present evidence illustrating 1) a reasonable probability that it and Lubriformance would have entered a business relationship but for Pitts's statements and 2) actual damage.

Concerning damages, AEG offered the affidavit of Wade Alexander to establish them. His discussion of same consisted of the following:

> AEG could not find the TNT 2K product for the same or cheaper prices than those offered by Lubriformance. As a result of Mr. Brin and Lubriformance's decision not to do business with AEG, AEG had to purchase another product

from another source at a higher price, thereby reducing AEG's profit margin on each gallon sold by AEG into which AEG added the TNT 2K product. AEG estimates at this time that it has suffered approximately $580,000 damages on the diesel products it has sold in which TNT 2K would have been added since November 12, 2018.

Conclusory testimony is not evidence. *In re L.C.L.*, 599 S.W.3d 79, 85 (Tex. App.—Houston [14th Dist.] 2020, pet. filed); *In re Diamond Shamrock Ref. Co.*, No. 07-06-0315-CV, 2007 Tex. App. LEXIS 141, at *6–7 (Tex. App.—Amarillo Jan. 10, 2007, orig. proceeding) (mem. op.). The same is true when attempting to establish lost profits; conclusory testimony will not support recovery even if coming from the business owner. *Nat. Gas Pipeline Co. v. Justiss*, 397 S.W.3d 150, 157 (Tex. 2012) (stating that a "business owner's conclusory or speculative testimony of lost profits will not support a judgment"). Required is reasonably certain evidence of lost profits based on objective facts, figures, or data. *Id.* (quoting *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992)). Missing from Wade's "estimates" are the objective facts, figures or data mandated by *Natural Gas*. Thus, Wade's conclusory testimony about AEG's having suffered around $580,000 in damages is not evidence of them. So, AEG failed to present clear and specific evidence establishing a prima facie case at least as to one element of its claim involving the statements to Lubriformance.

As for the cause of action as it relates to the statements to Old World, we found them insufficient to illustrate the statements were false or defamatory. So too did we conclude that AEG failed to present sufficient evidence establishing a prima facie case of antitrust activity between Western and Old World. This is of import because the cause of action under consideration requires proof that Western's conduct was independently tortious or unlawful. It not having been shown that Western engaged in such independent

tortious conduct when communicating with Old World, then that aspect of AEG's cause of action does not survive TCPA analysis.

With that, we rise from this TCPA mole-hole. We also conclude that the trial court erred in part when denying the entirety of Western's motion to dismiss. Consequently, we affirm in part, reverse in part, and render the order the trial court should have rendered. TEX. R. APP. P. 43.2(a), (c). That is, we dismiss AEG's claims of 1) antitrust, conspiracy, and the Lanham Act violations, 2) defamation, business disparagement, tortious interference with contract, and tortious interference with prospective business relations to the extent they are founded upon statements made to Chevron, CITGO, and Old World, and 3) business disparagement, tortious interference with contract, and tortious interference with prospective business relationships to the extent they are founded upon the statements made to Lubriformance. In all other things, the trial court's order is affirmed.

Brian Quinn
Chief Justice